# United States Court of Appeals

## For the First Circuit

No. 07-2820

TOWN OF MARSHFIELD,

Petitioner,

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL AVIATION ADMINISTRATION

Before

Boudin, Stahl and Howard,

Circuit Judges.

Andrea C. Ferster on brief for petitioner.
Elizabeth Ann Peterson, Andrew C. Mergen, M. Alice Thurston,
Environmental & Natural Resources Division, Department of Justice,
and Ronald J. Tenpas, Assistant Attorney General, on brief for
respondent.

December 18, 2008

**BOUDIN, Circuit Judge**.        The Federal Aviation Administration ("FAA") has authority to prescribe aircraft approach and departure patterns in order to minimize noise and ensure safety.  See 49 U.S.C. §§ 44502, 44505 (1994).  In 2002, the agency approved a change in the runway layout of Logan Airport in Boston to include a new runway and, at the same time, began a study of improved noise abatement measures.  The outcome was the "Boston Overflight Noise Study" ("BONS"), conducted with advice and participation by various organizations.

The participants in BONS included not only the FAA but also Massport, a Massachusetts entity that is responsible for Logan Airport; the Logan Community Advisory Committee ("CAC"), a community organization founded thirty years ago to represent interests affected by Logan's operations (and a sometime adversary of the airport); and the Boston Technical Advisory Committee ("BOS/TAC"), which provides technical advise to Massport and the CAC.

In October 2007, the FAA adopted certain of the BONS report's "phase I" measures for the rerouting of aircraft to increase use of Logan approaches and departures over the ocean with shoreline crossings at higher altitudes.  In finding that these measures required no environmental assessment ("EA") or environmental impact statement ("EIS"), the FAA relied upon noise studies to measure the impact on surrounding communities.  Deferred

-2-

to phase 2 and an expected phase 3 were possible measures that required more study and potentially more detailed and formal environmental analysis.

The Town of Marshfield, Massachusetts, located about 25 miles south of Logan Airport, opposed the new phase 1 measures, arguing that the new flight patterns would adversely affect its residents. It now seeks judicial review of the FAA's decision pursuant to 49 U.S.C. § 46110(a) (2004), claiming violations by the FAA of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. (2000), the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 1, § 1 et seq. (2000), and the FAA's own rules. We begin with the NEPA claim.

NEPA requires that "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" include a statement addressing, inter alia, "the environmental impact of the proposed action" and "any adverse environmental effects." 42 U.S.C. § 4332(c)(i), (ii). The NEPA statement or EIS, usually entailing substantial efforts and a detailed analysis, is not required if the agency supportably determines that no such "significantly affecting" impact will result. Id.

Agency regulations sometimes provide "categorical exclusions" identifying classes of actions that do not threaten environmental damage and thus do not require the preparation of an

EA or EIS. See generally 40 C.F.R. § 1508.4 (2003). An FAA order governing environmental assessments, FAA Order 1050.1E (June 10, 2004), provides (albeit in technical and somewhat opaque terms) a categorical exclusion for various departure, routing and approach procedures, see FAA Order 1050.1E, paras. 311g, 311i, 311p, an exclusion that the FAA treats as applicable to phase 1; but the exclusion is itself subject to a major qualification, which is at issue in this case.

The qualification states that where "extraordinary circumstances" exist, an otherwise categorically excluded action "could" require further environmental analysis, see FAA Order 1050.1E, Para. 304, and such circumstances include inter alia "an impact on noise levels of noise-sensitive areas," id. at para. 304f. A further provision, dealing specifically with noise, classes as significant a noise impact comprising an increase in decibel level of 1.5 dB or more--based on a day-night average ("DNL")--to or above the 65 dB level. Id. at App. A, para. 14.3. DNL is a measure that signifies the average day-night sound over the course of a year. Id. at App. A, para. 14.5a.

The FAA found that Marshfield "would experience noise below 45 DNL," which was well below the threshold of 65 DNL contour (the map line marking points where 65 dB registered). In fact, the FAA expert found that at practically all of the testing points in Marshfield, the noise levels would decrease, except at a single

-4-

measuring point (PT073) where the increase would be at most 0.2dB. Another expert, who peer-reviewed the FAA study and conducted additional data analysis, corroborated the agency's conclusion.

The calculations were done using a computer modeling program called the Integrated Noise Model ("INM"), which is one of three methods authorized in FAA Order 1050.1E. Id. at App. A, para. 14.2b. Marshfield says that the FAA should instead have used a different program called the Noise Integrated Routing System ("NIRS"), also identified in FAA Order 1050.1E. Id. Ordinarily, the agency would be entitled to use any reasonable methodology to arrive at a decision, e.g., Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 289 (4th Cir. 1999), but Marshfield says that FAA Order 1050.1E required the use of the NIRS methodology.

Marshfield's argument rests on a paragraph of FAA Order 1050.1E that says, most pertinently, that "[f]or air traffic airspace actions where the study area is larger than the immediate vicinity of an airport, incorporates more than one airport, or includes actions above 3,000 feet AGL, noise modeling will be conducted using NIRS." FAA Order 1050.1E App. A, para. 14.5e. The FAA does not claim that Marshfield is in the "immediate vicinity" of Logan, nor deny that some of the routing changes affect planes above 3,000 feet.

Rather, the FAA explains tersely in its brief that NIRS is a computer modeling tool for studying air traffic among multiple

-5-

airports over wide areas, and it provides a reference to the history of NIRS that arguably supports this gloss. In its reply brief Marshfield merely counters that the provision it relies on uses the word "will" and therefore requires the use of NIRS. It makes no effort to counter the FAA's explanation or to explain why NIRS calculation would be different or superior.

Where neither side has shed much light on a matter, judges tend to fault the appellant; "it is up to those who assail its findings or reasoning to identify the defects in evidence and the faults in reasoning." Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 60 (1st Cir. 2001). In this case, the FAA's assessment of minimal impact is not implausible. If there is a stronger argument for insisting that the FAA use NIRS or some other computer modeling program in cases like this, it can await an instance in which a more powerful argument is presented.

Marshfield next contends that its own expert calculated that noise levels would increase at least five decibels for the single data point location in Marshfield. Because both the FAA and the CAC experts calculated the number at 0.2 dB, it would take a detailed and cogent attack for us to find the FAA's factual conclusion unsupported or irrational. Id., 269 F.3d at 60. Marshfield's attack on the FAA figure of 0.2 dB for the location in question may be detailed but it is not persuasive.

The FAA's brief identifies several seeming methodological flaws in the Marshfield expert's assessment. These include (1) the calculation of noise exposure based on selective days and times when overflights were occurring rather than average DNL measurements and (2) a faulty assumption that because some flights produced noise of 50 dB or above all overflights produced noise at this level. It also appears that the town's expert regards increases at the 45 dB contour to be fatal whereas the FAA Order 1050.1E is primarily aimed at increases to or above the 65 dB contour level. We think the FAA's finding is adequately based.

In a further NEPA claim, Marshfield insists that the FAA erred by considering the impact of the phase 1 measures without regard to the possible further impact of measures that might be adopted during phase 2 or later phases. NEPA requires that a cumulative analysis include future actions that are "reasonably foreseeable." See 40 C.F.R. § 1508.7. The cumulative test is meant to ensure that a project is assessed as a whole and not sliced into "small component parts," id. § 1508.27(b)(7), which individually judged might elude assessment.

However, when the FAA determined to implement phase 1, some phase 2 action was foreseeable but one could only speculate as to which phase 2 measures would be implemented, cf. City of Oxford v. FAA, 428 F.3d 1346, 1354 (11th Cir. 2005) ("An agency must consider the cumulative impacts of future actions only if doing so

would further the informational purposes of NEPA."); indeed, the phrasing aimed to reserve decision on those steps that might involve a substantial environmental impact. Further, the negative impact of the phase 1 measures, as quantified by the noise study, appears to have been so slight that problems of cumulative effect vanish.

Further, the phase 1 measures were deemed independently valuable regardless of what happened in phase 2. This is not a case in which the agency's adoption of one step--say, the construction of footings for a major bridge--makes sense only if future steps are taken, and the first step effectively commits the agency to a further step. The phases address the same general set of problems, but it made perfect sense to move ahead phase 1 measures that posed no significant threat to the environment.

Finally, Marshfield seems to assert that an EA or EIS was required so long as the phase 1 measures were "highly controversial," which it regards as covering any introduction of new noise over inhabited areas and with opposition by a town or city. Although FAA Order 10501.1E, para. 304, uses the phrase "highly controversial," it makes clear that controversy is not decisive but is merely to be weighed in deciding what documents to prepare.

This brings us to Marshfield's claim under a different statute, namely, that the FAA violated the National Historical

Preservation Act, 16 U.S.C. §§ 470 et seq. (2000), by failing to consult the historic preservation officer. As incorporated by the FAA into its own regulations, the statute requires, in pertinent part, that "[u]ndertakings that have the potential to significantly affect historic properties pursuant to NEPA constitute an extraordinary circumstance requiring an EA even if the project normally qualifies as a categorical exclusion under NEPA." FAA Order 1050.1E, App. A, para. 11.2a.

The FAA does not dispute that the area in and around Marshfield contains various historic sites such as the Daniel Webster Library, but it argues instead that under the pertinent regulations, "[i]f the undertaking is a type of activity that does not have the potential to cause effects on historical properties, assuming such historic properties [are] present, the agency official has no further obligations under section 106 or this part." 36 C.F.R. 800.3(a)(1)(2000).

Here, the FAA found in the decision under review that "[t]here would be no potential for effects on [protected] historic or cultural resources," a view supported by the noise measurement study. Accordingly, the FAA's task was to report and document this finding to the preservation officer, 36 C.F.R. § 800.4(d)(1); City of Oxford, 428 F.3d at 1356-57. Where the preservation officer does not object, no consultation is required. See 1050.1E, para. 11.2b.

-9-

Marshfield's remaining challenge is that the FAA violated the FACA statute and underlying regulations. Specifically, it asserts that the agency relied on advisory committees subject to the statute but failed to provide public notice of meetings, open meetings to the public and assure that committee recommendations were not controlled by special interests. See 5 U.S.C. App. §§ 2(a), (b), 3(2), 10(a)(1), 10(a)(2); 41 C.F.R. § 102-3.105(g) (2001).

FACA does not apply to every entity whose views may be sought or considered by an agency--vast numbers of private organizations express their views to regulators; rather, it applies only to advisory committees or their equivalent "established or utilized by one or more agencies." 5 U.S.C. App. § 3(2)(C). Although the term "utilized" could be read broadly, courts have read it to apply only to committees that are under the actual management or control of the agency. Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 457-58 (1989); Center for Arms Control & Non-Proliferation v. Pray, 531 F.3d 836, 840 (D.C. Cir. 2008).

The two organizations that Marshfield deems to be covered by the statute are CAC and BOS/TAC. The former is not even remotely an advisory committee under the FAA's management or control. And although the FAA plays a role in BOS/TAC, it is at best a member of the forum and Marshfield points to no facts

-10-

showing that the FAA manages or controls BOS/TAC.  <u>See</u> <u>Byrd</u> v. <u>EPA</u>,
174 F.3d 239, 246 (D.C. Cir. 1999).

The petition for review is <u>denied</u>.