**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. CC-14-1225-TaDKi |
| JOSEPH WILLIAM SULLIVAN, | Bk. No. 8:14-bk-10711-CB |
| Debtor. | |
| JOSEPH WILLIAM SULLIVAN, | |
| Appellant, | |
| v. | MEMORANDUM[*] |
| WILLIAM HARNISCH; PECONIC PARTNERS LLC; PECONIC ASSET MANAGERS LLC, | |
| Appellees. | |

Argued and Submitted on October 23, 2014
at Malibu, California

Filed - December 9, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Catherine E. Bauer, Bankruptcy Judge, Presiding

_____

Appearances:     Sean A. O'Keefe of O'Keefe & Associates Law
Corporation, PC argued for Appellant Joseph
William Sullivan; Y. David Scharf of Morrison
Cohen LLP argued for Appellees William Harnisch,
Peconic Partners LLC, and Peconic Asset Managers
LLC

_____

Before: TAYLOR, DUNN, and KIRSCHER, Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

## INTRODUCTION

Fifteen days after debtor Joseph Sullivan filed a chapter 11[1] petition, Appellees, as holders of a large state court judgment and related judgment liens, filed a motion to dismiss the case as a bad faith filing. They contended that the case was a two-party dispute and that Debtor improperly filed solely to delay their collection efforts. They also argued that Debtor lacked any reasonable probability of confirming a chapter 11 plan because Appellees would vote against it.

Debtor opposed the motion, supported by his declaration and timely filed schedules, statement of financial affairs, and a chapter 11 status report. In the status report, he outlined the events leading to the filing of his petition, including Appellees' active efforts to execute on their judgment lien and to seize his non-exempt assets, and stated his intent to file a plan within the exclusivity period. The United States Trustee did not file any papers in response to Appellees' motion but advised the bankruptcy court orally that it did not join in the motion.

Notwithstanding the early state of the chapter 11 case and the merely circumstantial nature of Appellees' evidence, the bankruptcy court granted Appellees' motion, finding that Debtor filed the case in bad faith without any possibility of confirming a plan. Then, without considering or determining whether dismissal or conversion of the case would be in the best

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

interests of creditors and the estate, the bankruptcy court dismissed the case.  Because we determine that the bankruptcy court's failure to consider the best interests of creditors and the estate was an abuse of its discretion and further because we determine that its finding of bad faith was in error on this record, we REVERSE.

**FACTS**

Debtor filed his bare bones petition for relief under chapter 11 on February 4, 2014.  Eight days later he filed[2] a Chapter 11 Status Report and supporting declaration.

Chapter 11 Status Report

In the status report, Debtor presented his version of the prepetition disputes and six years of litigation between Debtor and Appellees in New York and the events immediately leading to the petition.  According to Debtor, he was employed until October 2008 as the Chief Operating Officer and Chief Compliance Officer of appellees Peconic Partners, LLC and Peconic Asset Managers, LLC (together, "Peconic").  He was also a member of Peconic entitled to share in profits.  He described Peconic as an institutional investment manager and registered investment adviser founded by appellee William Harnisch.

Disagreements arose, Debtor's employment was involuntarily terminated in late 2008, and litigation followed.  Although

---

[2]  The status report filed as docket 17 on the bankruptcy case electronic docket is not contained in the record provided by the parties in this appeal.  We have exercised our discretion to take judicial notice of documents electronically filed in the underlying bankruptcy case.  See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1989); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 392 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

- 3 -

Debtor recited some initial successes at the trial court level, such successes were overturned on appeal and eventually Appellees obtained a judgment of approximately $1.5 million that resolved one of several counterclaims Appellees filed against Debtor. The record contains no evidence that this judgment is nondischargeable; it appears to be based exclusively on contract. Debtor described the judgment as requiring that he repay to Peconic a $1 million advance that Peconic made to him, with interest. The judgment did not fully resolve the state court litigation. Debtor stated that costs to continue litigation plus entry of the judgment rendered him insolvent and that he filed bankruptcy seeking a breathing spell to allow him time either to reorganize his financial affairs through a plan of reorganization or to effect a liquidation through a liquidating plan.

Debtor set forth his intent to resolve a tax issue that could provide recovery of over $550,000[3] for the estate; to determine if and how to proceed with the remaining New York litigation; and to analyze the costs and benefits to recover as preferential transfers over $70,000 removed from Debtor's bank accounts by the sheriff as part of Appellees' collection efforts on the unstayed judgment and to deal with Appellees' judgment lien recorded against Debtor's New York residence.[4] Debtor also stated his intent to file a plan and disclosure statement within

---

[3] Debtor later increased his estimate of the potential tax recovery to $850,000. When Debtor filed the status report he already had obtained court approval to retain a CPA to pursue the recovery.

[4] Appellees filed the judgment with the New York County Clerk 89 days prior to the petition date, and Debtor did not post a bond to stop their collection efforts.

the 120 day exclusivity period.

Debtor described his primary assets as consisting of: a 50% interest in a residence owned in New York with his wife, with a market value of approximately $700,000 and subject to a mortgage and Appellees' judicial lien (combined total of $2.2 million); two 401K retirement accounts he claimed as fully exempt; and three vehicles owned free and clear, which he intended to claim as partially exempt. He estimated the total value of his assets at $749,002, exclusive of the potential tax refunds, a possible employment performance bonus, and pending claims against Appellees. Exclusive of the judgment, Debtor estimated total unsecured claims of $217,296.

Six days after filing the status report, Debtor filed his schedules and statement of financial affairs.

Schedules and Statement of Financial Condition

The Debtor's summary of schedules reflects $350,000 in real property assets and $397,985 in personal property assets for total assets of $747,985; secured debt of $2,007,347; unsecured claims of $231,036; and total liabilities of $2,238,383, which Debtor identified as primarily business debt, not consumer debt. Debtor's secured debt consisted of a $498,151 mortgage secured by the New York residence and the $1,509,195 judgment. His scheduled unsecured debt consisted of $52,208 on four credit cards; $73,192 owed to three different law firms; $600 in membership dues; $27.00 in unpaid utilities; and $105,000 in personal loans from two individuals (Gerard Sullivan and Thomas Sullivan, apparently members of Debtor's family).

In his statement of financial affairs, among other things,

- 5 -

Debtor disclosed $875,000 in gross income in 2013 which included $675,000 that he described as a gross settlement amount; $242,639 in IRA distributions taken in the two years preceding bankruptcy; $249,000 paid to the IRS and Franchise Tax Board in November 2013; the pending litigation in New York and related entry of a sister state judgment in California in November 2013; and multiple restraining orders, account restrictions, and apparent levies on behalf of Appellees in the two months preceding the bankruptcy filing. Debtor also disclosed legal retainers of $222,543 paid in the one year pre-filing, $98,000 of which was paid by Gerard, Joseph, or Thomas Sullivan. Of the retainers paid, $42,049 was for fees incurred pre-petition.

The day after Debtor filed his schedules and statement of financial affairs, Appellees filed their motion seeking dismissal of the case.

The Motion to Dismiss

Appellees' motion[5] sought dismissal of the case under § 1112 on the stated grounds that: (1) Debtor filed the petition in bad faith – to "delay, hinder or interfere with enforcement" of Appellees' judgment; (2) Debtor had "no reasonable probability of confirming a Chapter 11 plan"; and (3) the filing was a "strategic move in a two-party dispute." Motion, Dkt. #38 at 6:6-9. Appellees supplied no evidence in support of their contentions beyond a request that the bankruptcy court take judicial notice of the record in the New York litigation which

---

[5] Appellees' only support for the motion was a declaration that authenticated and attached documents consisting primarily of documents filed by the parties at various stages of the six years of litigation in New York.

documented their litigation victory but failed to evidence either a judgment that would be nondischargeable or any kind of inappropriate litigation conduct by Debtor.

Lack of a confirmable plan

Appellees argued that Debtor's chapter 11 case must be dismissed based on the lack of any reasonable likelihood that Debtor could propose a confirmable plan of reorganization.[6]  They argued that they would not consent to any plan that proposed less than 100% payment on unsecured creditors' claims.

Two-party dispute and timing of petition[7]

Appellees also contended that Debtor's case represented a typical two-party dispute and that through the bankruptcy case Debtor sought to collaterally attack final rulings in New York. They argued that Peconic was the creditor most impacted by any proposed plan and that the New York forum, not the bankruptcy court, would best and adequately protect all parties and assure a just and equitable result.  Appellees made no attempt to explain

---

[6] Appellees based this argument on In re C-TC 9th Ave. P'ship v. Norton (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 1309-10 (2nd Cir. 1997) ("a Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose") (citing Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994)).

[7] For the balance of their arguments, and the factors identified and analyzed, Appellees relied on Marshall v. Marshall (In re Marshall), 721 F.3d 1032, 1048 (9th Cir. 2013) (in considering bad faith as cause for dismissal, courts "may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'"); In re Leavitt, 171 F.3d 1219, 1225 (9th Cir. 1999) (dismissal with prejudice of chapter 13 case for bad faith requires consideration of whether debtor misrepresented facts or manipulated the Bankruptcy Code, debtor's history of filings and dismissals, whether debtor "only intended to defeat state court litigation," whether egregious behavior is present); and In re Ellsworth, 455 B.R. 904, 917-18 (9th Cir. BAP 2011) (same).

- 7 -

how the New York forum would protect anyone other than Appellees.

Misrepresentations/manipulation

As additional indication of Debtor's alleged bad faith, Appellees asserted that Debtor was less than forthright in his filings in the bankruptcy case. In support, Appellees contended that Debtor's characterization of his debts as primarily business debts, rather than consumer debts, was improper. Appellees argued that the judgment debt was for repayment of funds Debtor borrowed for personal or family purposes, that Debtor mischaracterized this debt as a tax advance, and that the related legal fees also were not business expenses. They provided no case law support for their argument regarding characterization of Debtor's debts. Appellees also argued that Debtor lacked substantial unsecured debt and that this suggested that Debtor was abusing the system.

Other indicators of bad faith

Appellees also argued that Debtor's failure to pay anything toward the judgment prior to filing bankruptcy showed Debtor's bad faith. Finally, Appellees also contended that they would get nothing under a plan by Debtor, there was no business to be preserved, there were no jobs to be saved – and, thus, that there was no proper purpose for Debtor's case. Appellees failed to explain how their business preservation arguments squared with the fact that this is an individual chapter 11 case.

Conversion to chapter 7 not a proper option

Based on Appellees' conclusion that Debtor's debts were primarily consumer debts, Appellees argued that a presumption of abuse would arise under § 707(b) if Debtor were to seek

conversion of his case to chapter 7.  Therefore, Appellees summarily concluded, conversion to chapter 7 was not an option. Appellees provided no case law to support this conclusion.

Debtor's Opposition

Debtor opposed the motion and supported the opposition with his declaration.  Debtor described himself as a 57-year-old resident of Seal Beach, California, employed as an investment executive at a salary of $200,000 per annum.

Relying on the legal standard identified by the Ninth Circuit in In re Arnold, 806 F.2d 937, 939 (9th Cir. 1986),[8] and citing In re Marshall, 298 B.R. 670, 680-81 (Bankr. C.D. Cal. 2003), Debtor argued that the "good faith inquiry 'is essentially directed to two questions: (1) whether the debtor is trying to abuse the bankruptcy process and invoke the automatic stay for improper purposes; and (2) whether the debtor is really in need of reorganization.'"  Opposition, Dkt. #68 at 14:13-16.  Debtor stated that he was forced to file bankruptcy to obtain a breathing spell from Appellees' aggressive collection efforts and that he filed with the intent to prepare a fair and equitable plan of reorganization.  He argued that he was hopelessly insolvent both from a balance sheet perspective and from his inability to pay debts as they became due in light of the accrual of 9% interest on the judgment ($150,000 annually) compared to

---

[8]  Debtor provided the following quote from the Ninth Circuit's decision in In re Arnold: "The existence of good faith depends on an amalgam of factors and not upon a specific fact. The bankruptcy court should examine the debtor's financial status, motives, and the local economic environment. . . .  Good faith is lacking only when the debtor's actions are a clear abuse of the bankruptcy process."  806 F.2d at 939 (internal citation omitted).  Opposition, Dkt. #68 at 14:9-11.

his current before-tax annual salary of $200,000. Debtor also argued that through the bankruptcy filing he sought to preserve the home he owned in New York with his wife.

As to Appellees' specific allegations of bad faith factors, Debtor responded as follows:

Plan confirmability

Debtor primarily argued that consideration of confirmability of a plan not yet filed was premature and placed an improper burden on him at such an early stage of the case. Debtor argued that despite Appellees' contention that they will thwart any plan the Debtor files, "[f]requently even the most obstreperous of creditor ultimately finds common ground with the debtor later in the case." Opposition, Dkt #68 at 15:1-2. In addition, Debtor argued that ample law existed to justify separately classifying the Appellees' claim given their particular characteristics, including receipt of a preferential transfer within 90 days prior to the petition.[9]

Two-party dispute

Debtor argued that the bankruptcy case involved over $400,000 in other claims and thus, factually, did not constitute a two-party dispute. As to Appellees' collateral attack argument, Debtor argued that he did not seek to defeat the validity of the judgment in the bankruptcy court, but would treat the judgment under the plan in accordance with the Bankruptcy

---

[9] In a footnote in the opposition, Debtor alleged that Peconic filed a transcript of the judgment with the Clerk of Nassau County, New York, on January 17, 2014, which resulted in the creation of a lien in favor of Peconic on the residence in New York owned by the Debtor with his wife.

Code, including distributions and appropriate discharge of any unpaid balance, "[u]nless and until the New York Judgment is vacated in the course of a continuation of the New York Action." Id. at 18:10-11.

### Alleged misrepresentations and the conversion option

Debtor argued that he properly categorized his case as a non-consumer case. Because the debt resulted from a judgment on a business dispute between employer and employee, Debtor argued it had no consumer attributes. Thus, Debtor argued that chapter 7 was clearly an option.

### Other alleged bad faith indicators

Debtor argued that Appellees were wrong to contend that Debtor had the ability to pay the judgment, especially in light of the accruing interest.

### Other arguments

Debtor finally argued that the Supreme Court's decision in Toibb v. Radloff, 501 U.S. 157 (1991), specifically held that an individual is eligible to reorganize under chapter 11 despite the lack of any ongoing business. Further, Debtor argued that his filing was consistent with the objectives of the Bankruptcy Abuse Prevention and Consumer Protection Action ("BAPCPA"): "to channel individuals with higher levels of income and larger balance sheets into Chapter 13, or Chapter 11." Id. at 21:20-21. He acknowledged in his opposition that § 1115, added by BAPCPA, brings an individual chapter 11 debtor's post-petition income into the estate, and that § 1129(a)(15), also added under BAPCPA, requires that he commit five years of projected disposable net income to his plan effort.

Appellees' Reply

On reply, Appellees responded that although they believed Debtor was capable of paying all his debts, Debtor's allegation that he was insolvent established his inability to present a confirmable plan, and thus the case should be dismissed.[10] Appellees argued that the case was simple: Debtor "lives a lavish lifestyle" and "filed this case in order to maintain his current level of spending," and concluded that, therefore, the case "does not belong in bankruptcy." Reply, Dkt. #77 at 9:7-14.

The bankruptcy court's findings and conclusion

The hearing on the motion was set concurrently with Debtor's applications to employ two law firms, his motion for approval of his budget, and a chapter 11 scheduling and management conference. The bankruptcy court heard argument on the Appellees' motion first. Counsel for the United States Trustee, who appeared but did not otherwise participate in the arguments, advised the bankruptcy court that the United States Trustee did not join in the motion. After oral argument by the parties, and without allowing testimony or other additional evidence, the bankruptcy court took the motion under submission and continued the other hearings. Shortly thereafter, it issued its written Statement of Decision and a separate order dismissing the case.

In the Statement of Decision the bankruptcy court held that

---

[10] Appellees also argued against Debtor's contention that Appellees' judgment appropriately could be separately classified and presented their assessment of Debtor's legitimate debts and his inability to appropriately identify an impaired class capable of accepting a plan over Appellees' objection. And Appellees argued that Debtor's arguments that his debts are not consumer debts were unsupportable.

the bankruptcy case was not filed in good faith. It stated that "[t]he existence of good faith depends on an amalgam of factors and not upon a specific fact," criticizing Debtor's argument that his subjective good faith in filing the case was important. Statement of Decision, Dkt. #93 at 2 n.1 (citing In re Arnold, 806 F.2d at 939). It identified as the appropriate test: "whether a debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." Id. (again citing In re Arnold, along with In re Marsh, 36 F.3d at 828).

The bankruptcy court then specifically found that: "It is obvious that Debtor's sole purpose for filing bankruptcy was to stop Peconic from collecting on its judgment." Id. at 3:1-3. As supporting facts it stated that the case was a two-party dispute filed after six years of litigation, only 89 days after judgment was entered against the Debtor, and when Peconic had just begun collection efforts.

In addition, the bankruptcy court found that "a confirmable plan of reorganization is not possible since Peconic (by far the largest unsecured creditor), has indicated that it will vote against any plan of reorganization that does not propose to pay unsecured creditors 100 percent of their claims." Id. The bankruptcy court referred to Debtor's estimation in the bare bones petition that there would be no funds available for distribution to unsecured creditors; and it concluded that Debtor could not artificially impair his mortgage lender because there was no unsecured portion to impair.

The Debtor timely filed a notice of appeal to the BAP and an

- 13 -

emergency motion with the bankruptcy court for stay pending appeal, which was denied. Debtor thereafter filed a motion with the BAP for a stay pending appeal, which a motions panel granted.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court abused its discretion when it dismissed the bankruptcy case.

## STANDARD OF REVIEW

We review the bankruptcy court's decision to dismiss a case under an abuse of discretion standard. Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1223 (9th Cir. 1999). We apply a two-part test to determine whether the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). First, we consider de novo whether the bankruptcy court applied the correct legal standard to the relief requested. Id. Then, we review the bankruptcy court's fact findings for clear error. Id. at 1262 & n.20. See also Eisen v. Curry (In re Eisen), 14 F.3d 469, 470 (9th Cir. 1994) (the bankruptcy court's finding of "bad faith" is reviewed for clear error); St. Paul Self Storage Ltd. P'ship v. Port Auth. (In re St. Paul Self Storage Ltd. P'ship), 185 B.R. 580, 582 (9th Cir. BAP 1995) (same). We must affirm the bankruptcy court's fact findings unless we conclude that they are illogical, implausible, or without support in the record. Hinkson, 585 F.3d at 1262. We may view a factual determination as clearly

- 14 -

erroneous if it was without adequate evidentiary support or was induced by an erroneous view of the law. Wall St. Plaza, LLC v. JSJF Corp. (In re JSJF Corp.), 344 B.R. 94, 99 (9th Cir. BAP 2006).

**DISCUSSION**

The bankruptcy court dismissed Debtor's case as a bad faith filing based on two primary determinations: (1) its factual finding that the case was a two-party dispute and that Debtor's sole purpose in filing was to stop Appellees' collection efforts; and (2) its legal conclusion that Debtor could not propose a confirmable plan.  These determinations are not supported adequately by the record.  Alternatively, the bankruptcy court abused its discretion by dismissing the case without considering whether conversion or dismissal would be in the best interests of all creditors and the estate.

Section 1112(b)(1) provides in relevant part that ". . . the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ."  11 U.S.C. § 1112(b)(1).  If cause is established, the decision whether to convert or dismiss the case falls within the sound discretion of the court.  Mitan v. Duval (In re Mitan), 573 F.3d 237, 247 (6th Cir. 2009); Nelson v. Meyer (In re Nelson), 343 B.R. 671, 675 (9th Cir. BAP 2006) (chapter 13 case).  And, if a bankruptcy court determines that there is cause to convert or dismiss, it must also: (1) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate;

- 15 -

and (2) identify whether there are unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate. § 1112(b)(1), (b)(2); and see Shulkin Hutton, Inc., P.S. v. Treiger (In re Owens), 552 F.3d 958, 961 (9th Cir. 2009) ("the court must consider the interests of all of the creditors"); In re Prods. Int'l Co., 395 B.R. 101, 107 (Bankr. D. Ariz. 2008).

**A.    The bankruptcy court abused its discretion when it failed to consider whether conversion or dismissal was in the best interests of all creditors and the estate.**

We determine as a preliminary matter that even if we determine that the bankruptcy court's findings of bad faith and plan futility were not in error, the bankruptcy court abused its discretion by failing to consider whether conversion or dismissal was in the best interests of all creditors and the estate. We also determine that on the current record this error was not harmless. We begin here because clarification on this point provides guidance in our analysis of the bankruptcy court's other determinations.

Appellees argue on appeal that dismissal was in the best interests of creditors and that Debtor waived any contrary argument because he did not raise it in his opposition to the motion. We disagree. In the motion and opposition the parties both argued as to whether chapter 7 was an available option for the Debtor.[11] And regardless of the parties' arguments, the

---

[11] Both sides focused their arguments, however, on whether Debtor's case would be subject to dismissal as an abuse pursuant to § 707(b) due to Debtor's income level and the nature of his debts. Appellees argued that Debtor mischaracterized his consumer debts as primarily business debts; Debtor argued to the
(continued...)

- 16 -

bankruptcy court had an independent obligation under § 1112 to consider what would happen to all creditors on dismissal and, in light of its analysis, whether dismissal or conversion would be in the best interest of all creditors, not just the largest and most vocal creditor. See In re Owens, 552 F.3d at 961 (agreeing with the Fourth Circuit that "when deciding between dismissal and conversion under 11 U.S.C. § 1112(b), 'the court must consider the interest of all of the creditors.'") (quoting Rollex Corp. v. Assoc. Materials (In re Superior Siding & Window, Inc.), 14 F.3d 240, 243 (4th Cir. 1994)).

When determining the best interest of the creditors under § 1112(b), the Code's fundamental policy of achieving equality among creditors must be a factor considered, "and it is not served by merely tallying the votes of the unsecured creditors and yielding to the majority interest." In re Superior Siding & Window, Inc., 14 F.3d at 243; and see In re Graphic Trade Bindery, Inc., 2012 Bankr. LEXIS 1598 at *17 (Bankr. D. Md. Apr. 12, 2012) ("the mere fact that a section 1112(b) motion seeks only conversion is no bar to dismissal if the court determines that dismissal is in the best interest of the creditors and the estate. The opposite is also true. The task of the bankruptcy court is to determine which option is the better choice.").

While we acknowledge that unsecured creditors did not take a position here, it is notable that the United States Trustee made clear that it did not support dismissal.

_____

[11](...continued)
contrary.

- 17 -

Based on our reading of the hearing transcript, it appears that the bankruptcy court may have believed that its limited task was to grant or deny the relief requested by Appellees – dismissal. The bankruptcy court was not so limited. It had at least three options available to it: let Debtor try to propose a plan; convert the case to chapter 7; or dismiss it, as Appellees requested. When considering these options, the bankruptcy court was required to consider the unrefuted evidence that: (1) Appellees had judgment liens and immediate collection abilities superior to all of Debtor's unsecured creditors upon dismissal of the case; (2) Appellees' judgment liens, however, were subject to attack as preferences; (3) there was no evidence that creditors other than Appellees had any avenue for prompt or meaningful payment outside a bankruptcy case; (4) recovery of the tax refund would be enhanced in either a chapter 11 or chapter 7 case; and (5) dismissal as a result of these factors was far less advantageous than conversion for all creditors of the estate other than Appellees. This was not harmless error.

We cannot determine from the record whether the bankruptcy court believed that § 707(b) barred conversion to chapter 7, but the Appellees certainly argued that this was the case. We disagree; § 707(b) abuse analysis did not bar conversion on this record.

There is a substantial body of decisional law[12] focusing on the applicability of § 707(b) when a debtor seeks to voluntarily

---

[12] For an interesting survey of the majority, minority, and hybrid approaches, see Anna Haugen, James C. Eidson and Amir Shachmurove, Should § 707(b) Apply in Chapter 7 Cases Converted from Chapter 13?, 33-4 Am. Bankr. Inst. J. 48 (2014).

convert a chapter 13 case to chapter 7 – and the courts are split as to whether conversion under these facts is appropriate. We located only one case discussing a debtor's attempt to voluntarily convert a chapter 11 case to chapter 7. See In re Traub, 140 B.R. 286 (Bankr. D.N.M. 1992). We located no case authority, and the parties cited none, addressing the applicability of § 707(b) abuse analysis to chapter 7 cases converted involuntarily from chapter 11. Dismissal under § 707(b), however, requires the exercise of the bankruptcy court's discretion; the statute states that the bankruptcy court "may" dismiss - dismissal is not required.

Further, the bankruptcy court's ability to rely on § 707(b) for dismissal requires a determination that the Debtor's debts were primarily consumer. Suffice it to say that this question is, at best for Appellees, an open one.

Finally, we are aware of individual chapter 11 cases converted to chapter 7 by court order after either failure by debtors to achieve plan confirmation timely or as a result of default under confirmed chapter 11 plans – none of which involved "means test" or § 707(b) abuse consideration. We located nothing in the record before the bankruptcy court to support a conclusion that Debtor's chapter 11 case would not be eligible for conversion to chapter 7 in the event Debtor was not able to confirm a plan because Appellees ultimately prevailed in a plan objection based on their veto under § 1129(a)(8).

The bankruptcy court here failed to consider whether dismissal or conversion was in the best interests of the creditors and the estate. Conversion was and is a viable option

even if § 707(b) is applicable. And given the facts in the record currently before us, we cannot conclude that the bankruptcy court's failure to consider conversion was harmless error. The evidence strongly suggests that conversion is in the best interest of all creditors other than Appellees. Thus, the bankruptcy court erred in this regard.

**B.    The bankruptcy court erred when it found the Debtor filed this case not in good faith.**

The bankruptcy court has broad discretion in determining what constitutes "cause" under section 1112(b). See Chu v. Syntron Bioresearch, Inc. (In re Chu), 253 B.R. 92, 95 (S.D. Cal. 2000). The movant bears the burden of establishing by a preponderance of the evidence that cause exists. StellarOne Bank v. Lakewatch LLC (In re Park), 436 B.R. 811, 815 (Bankr. W.D. Va. 2010). Because good faith is required in the commencement and prosecution of a chapter 11 case, "the lack thereof constitutes 'cause' for dismissal under § 1112(b)(1)." In re Mense, 509 B.R. 269, 276 (Bankr. C.D. Cal. 2014) (citing In re Marsch, 36 F.3d at 828 ("Although section 1112(b) does not expressly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal.")). "The good faith requirement 'deter[s] filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws.'" Id.

The bankruptcy court found that the bankruptcy case was a two-party dispute with no possibility of plan confirmation and was filed for the sole purpose of stopping Appellees' collection on their judgment. The limited record then before the bankruptcy

court in the early stages of the case does not support these findings and conclusions.

### 1. The bankruptcy court erred by finding Debtor's sole and bad faith purpose was to stop Appellees' collection efforts.

It is well recognized that the automatic stay under § 362, activated upon filing a bankruptcy petition (with some exceptions not applicable here), is intended to provide debtors in bankruptcy with a breathing spell from their creditors' collection actions. And it is not unusual to encounter a chapter 11 case filed "because of the crushing weight of a judgment." In re Marshall, 298 B.R. at 683. If, however, a debtor seeks to use a chapter 11 filing to "unreasonably deter and harass creditors," such a filing lacks good faith. In re Marsch, 36 F.3d at 828.

The bankruptcy court here found that Debtor filed his chapter 11 case solely to stop Appellees' collection efforts and concluded that this constituted bad faith. The bankruptcy court made no finding that stopping Appellees' collection efforts was unreasonable or was intended to harass Appellees, however, and we find no support in the record for such inferences.

Based on Debtor's schedules and statement of financial affairs, for at least the two years preceding the bankruptcy filing, Debtor supplemented his salary with substantial withdrawals from retirement accounts, credit cards, and significant loans from family members. Then two months before filing, Appellees commenced aggressive collection efforts, freezing or levying against bank and brokerage accounts. The Debtor concurrently continued to incur substantial legal fees.

- 21 -

As stated in Debtor's declaration in opposition to the motion, which was not disputed by any evidence submitted by Appellees, the litigation costs, entry of the judgment, and unpaid legal bills left him insolvent. Appellees' contrary argument that Debtor was solvent and could and should have paid Appellees' judgment is not supported by the record.

At oral argument, the bankruptcy court expressed its disbelief[13] in assertions by Debtor that he was financially strapped prepetition, when he had a house in New York that he planned to keep and three high-end vehicles – unlike the people the bankruptcy court was "used to" – "people who literally are living in homeless shelters." Hr'g Tr. (Apr. 9, 2014) at 17:22-23. The bankruptcy court directed argument away from Debtor's alleged insolvency,[14] as a "non-issue." Id. at 15:17. As articulated by the Ninth Circuit, however, when assessing a debtor's good faith the bankruptcy court "should examine the debtor's financial status [and] motives. . . ." In re Arnold, 806 F.2d at 939. Here, the bankruptcy court's disinclination to examine the Debtor's financial status beyond his possession of a home in New York and three admittedly valuable vehicles

---

[13] The bankruptcy court told Debtor's counsel "don't tell me this gentleman is impoverished, please." Hr'g Tr. (Apr. 9, 2014) at 18:10-11.

[14] Nonetheless Debtor's counsel advised the bankruptcy court that Debtor moved to California, not because he wanted to be 2,000 miles away from his wife, but because he had to do so for employment. His wife remained in New York as a cancer survivor who had a network of people and medical caregivers supporting her there.

contributed to its erroneous conclusion.[15]

Debtor's petition, filed within 89[16] days of perfection of Appellees' judgment lien, not only appropriately provided Debtor a breathing spell,[17] it laid the ground work for another key goal underlying the bankruptcy process, leveling the playing field for other creditors of the estate. See In re Superior Siding & Window, Inc., 14 F.3d at 243. Appellees appear to have obtained their judgment lien within the preference period. Not surprisingly, Appellees argued that they would be better off if allowed to pursue collection on their judgment outside of the bankruptcy case – absent the bankruptcy filing, Appellees would have a substantial advantage over other creditors.

In addition, Debtor stated his clear intention to save equity in the New York home, where his wife lived, and his desire for orderly liquidation of assets if he could not propose a confirmable plan. The record does not evidence that the bankruptcy court considered either of these goals. But both goals are legitimate reasons to file bankruptcy. See Warner v. Universal Guardian Corp. (In re Warner), 30 B.R. 528, 529 (9th

[15] As recently discussed by the Ninth Circuit, "bankruptcy law must apply equally to the rich and poor alike, fulfilling the Constitution's requirement that Congress establish 'uniform laws on the subject of bankruptcies throughout the United States.'" Hawkins v. Franchise Tax Bd. of Cal., 769 F.3d 662, 669 (9th Cir. 2014).

[16] The record is not fully developed as to the mechanism by which Appellees obtained lienholder status; it appears undisputed, however, that Debtor's filing on February 4, 2014, put Appellees' lien status within the 90-day preference period.

[17] At the hearing on the motion, Debtor's counsel argued that the breathing spell benefit of the automatic stay was negated here by Appellees' quickly filed motion.

Cir. BAP 1983) (Nothing in the Code prohibits the use of chapter 11 by debtors seeking to save their family home from foreclosure); and In re Soundview Elite, Ltd., 503 B.R. 571, 580 (Bankr. S.D.N.Y. 2014) ("it is not bad faith to file a chapter 11 petition for the purpose of a more orderly liquidation."). And although Debtor had not filed a proposed plan as of the hearing on the motion, Debtor argued that through the chapter 11 bankruptcy process he intended to seek recovery of as much as $850,000 on overpayment of taxes.

All the evidence before the bankruptcy court indicated that Debtor had significant financial need for protection under the Bankruptcy Code. No evidence was presented from which the bankruptcy court could infer that Debtor intended to unreasonably deter or harass Appellees or any of his other creditors.

**2. The existence of disputes between Debtor and Appellees does not render the case a two-party dispute filed in bad faith.**

"Petitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors." In re Stolrow's, Inc., 84 B.R. 167, 171 (9th Cir. BAP 1988). Courts that find bad faith based on two-party disputes do so where "it is an apparent two-party dispute that can be resolved outside of the Bankruptcy Court's jurisdiction." Oasis at Wild Horse Ranch, LLC v. Sholes (In re Oasis at Wild Horse Ranch, LLC), 2011 Bankr. LEXIS 4314 at *29 (9th Cir. BAP Aug. 26, 2011) (emphasis added) (citing N. Cent. Dev. Co. v. Landmark Capital Co. (In re Landmark Capital Co.), 27 B.R. 273, 279 (D. Ariz. 1983)); and see St. Paul Self Storage Ltd. P'ship, 185 B.R. at 583 (debtor's only significant asset was a claim against one

- 24 -

creditor set to be tried in state court and bankruptcy court supervision of debtor's liquidation was not necessary to protect other creditors). Typical bad faith two-party dispute cases may involve delays on the eve of trial (litigation tactics), forum shopping, new-debtor syndrome (special purpose entities), repeat filers, and repeatedly delayed foreclosure sales. There are no such common indicators here.

The evidence before the bankruptcy court established that the parties were involved in six years of litigation in state court prior to the petition date; Debtor was using exempt assets, family loans, and credit card debt to fund the litigation and his expenses; and Appellees started to aggressively collect on their judgment. With assets of approximately $750,000 versus the $1.5 million judgment, and interest accruing at 9% on the judgment versus Debtor's annual salary of $200,000, Debtor was balance sheet and cash flow insolvent before considering living expenses and other significant debt. Such numbers do not support the bankruptcy court's implicit determination that resolution outside the bankruptcy court was preferable or even possible. This was not a case where Appellees offered any kind of settlement or any resolution of the judgment other than Debtor's full liquidation. Nor does the evidence support a conclusion that the bankruptcy filing did not provide important protection to other legitimate creditors by leveling the playing field. "Good faith is lacking only when the debtor's actions are a clear abuse of the bankruptcy process." In re Arnold, 806 F.2d at 939. Keeping the Appellees from seizing all liquid assets ahead of other creditors and bringing preferential transfers back into the

- 25 -

estate for the benefit of all creditors not only do not constitute abuses of the bankruptcy process, they achieve primary goals of the bankruptcy process. Nor did Appellees present any evidence to support an inference that Debtor sought to have the bankruptcy court act as an appellate court in connection with the pending state court matters or to shift to the bankruptcy court the decision making on claims in the state court litigation.

During oral argument on the motion, the bankruptcy court repeatedly stated that Debtor had one creditor. Appellees argued that Debtor's scheduled debts were insignificant and questionable – Appellees were most affected by the filing, and, implicitly, of singular importance. To the contrary, Debtor's schedules, which the bankruptcy court acknowledged having reviewed, establish the existence of significant debt owed to credit card companies, attorneys, and family members. The bankruptcy court had no evidence before it from which it could appropriately infer that any of such debt was not legitimate. Nor did any evidence exist to dispute Debtor's contention that the interest accrual on the judgment alone made his financial survival outside of bankruptcy impossible. To conclude otherwise was not supported by the record.

**3. Appellees' stated intention not to accept a less-than-100%-plan by Debtor, alone, does not support a conclusion that Debtor filed the case in bad faith.**

The bankruptcy court also found that Debtor could not propose a confirmable plan because Appellees argued they would vote against it. Many are the judgment creditors who gnash their teeth (metaphorical or otherwise) in chagrin when their collection campaign is stayed by a bankruptcy filing. Only

- 26 -

slightly less frequent are the immediate post-filing threats that no quarter will be given. Such jeremiads, however, are not a sufficient basis for a universal conclusion of plan futility. And they certainly do not unequivocally establish the debtor's bad faith. Economic considerations and rationality often result in resolution.

Here, the Appellees' statements must be taken in context. Debtor had not filed a plan, and Appellees, apparently, had not had time to compare their possible treatment under a plan with the certainly less favorable treatment in a chapter 7 case. It is indeed possible that Appellees would elect chapter 7, notwithstanding that they lose the opportunity to obtain any access to Debtor's post-petition income. It is further possible that the tax refunds will not be more easily collected in a chapter 11 case such that this factor does not support a continuation in chapter 11. And it is certainly possible that the Debtor will try to take advantage of his creditors rather than dealing with them forthrightly as he promises. But the possibility that the Appellees will not act in their economic best interest, when the choice is correctly presented as not being limited to dismissal or chapter 11, or that the Debtor will act in a manner inconsistent with the only evidence before the bankruptcy court, do not equate to bad faith. Here, the only evidence is not supportive of bad faith and only suggestive of plan futility. Indeed, it is worth noting that the Appellees' stated unwillingness to ever support Debtor's plan was not supported by declaratory evidence of any type. It is possible that this is a reasoned response that would retain rationality

even if conversion is the alternative, but on this record it is illogical to so assume.

Moreover, nothing in the record indicates that Debtor was aware that Appellees would take such a position when he filed his petition. And when the bankruptcy court ruled on the motion, Debtor had not filed a proposed plan at all.[18] In essence, the bankruptcy court concluded, based on a very scant record, that Debtor could neither propose the 100% plan Appellees demanded, negotiate a consensual resolution, or cram down a lesser payout plan.[19] Such determinations were premature.

We note that Debtor acknowledged that his postpetition earnings and net disposable income are available in a chapter 11

---

[18] At oral argument, the bankruptcy court heard the Debtor to suggest that he would artificially impair the secured lender on the New York property to obtain an impaired class to vote in favor of a future plan. The bankruptcy court included in its findings, however, that the "New York property is worth more than what is owed to the secured lender, so there is no unsecured portion to impair." Statement of Decision at 2. We were unable to find support in the record for this finding. Debtor scheduled 50% of the estimated value of the New York residence as property of the estate due to his nonfiling wife's joint interest, but it is not clear from the schedules whether Debtor likewise scheduled 50% of the mortgage debt against the property or 100%. Nor did we locate any evidence regarding the status of payments to the mortgage lender or whether Debtor's nonfiling spouse contributed to the mortgage payments or had independent assets or income.

[19] The bankruptcy court referred to an estimate contained in Debtor's petition itself that no funds would be available for distribution after exempt property and administrative claims. In his appellate opening brief, Debtor undertook to explain in a footnote that the "no distribution" box in the emergency petition, as referred to by the bankruptcy court, was checked automatically by the software system used by counsel. As the bankruptcy court acknowledged at oral argument on the motion that it had reviewed the schedules and other documents on the docket, which necessarily included Debtor's multiple declarations, we conclude that reliance on a checked box on the bare bones petition was insufficient grounds for the bankruptcy court to conclude no plan could be confirmed.

- 28 -

plan. Under § 502 of the Code, Appellees would not be entitled to the 9% interest on their judgment postpetition,[20] reducing the amount required to be paid from Debtor's not-insubstantial $200,000 annual salary. Debtor proposed to seek a large recovery from the IRS to contribute to plan payments. And Debtor's schedules disclosed not-insignificant amounts of exempt assets that the Debtor could, if so inclined, commit to a chapter 11 plan payout. Such possibilities were neither discussed nor considered nor given adequate time for development.

Although it is well within a bankruptcy court's decision-making authority to determine facial non-confirmability of a proposed plan (such as when considering a motion for approval of a filed disclosure statement[21]), determining the facial non-confirmability of an unfiled plan so early in the case and absent a fully developed record is not supportable. See Can-Alta Props., Ltd. v. State Sav. Mortg. Co. (In re Can-Alta Properties, Ltd.), 87 B.R. 89, 92-93 (9th Cir. BAP 1988) (lifting of the automatic stay based on bad faith, where the court lacked evidence of confirmability or feasibility of a plan and afforded no opportunity for the debtor to amend the then existing plan to respond to the court's concerns, constituted an abuse of discretion).

[20] Section 502(b)(2) provides for the disallowance of a claim to the extent that "such claim is for unmatured interest."

[21] See e.g., In re Main St. AC, Inc., 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) (a court may disapprove of a disclosure statement if the plan to which it refers could not possibly be confirmed).

**CONCLUSION**

Based on the foregoing, we REVERSE.