FILED

MAY 29 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No.   EC-14-1067-KuPaJu |
| | ) |
| GLENN GREGO, | ) Bk. No.   14-20064 |
| | ) |
| Debtor. | ) |
| _____ | ) |
| GLENN GREGO, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) **MEMORANDUM**[*] |
| | ) |
| UNITED STATES TRUSTEE, | ) |
| | ) |
| Appellee. | ) |
| _____ | ) |

Argued and Submitted on May 14, 2015
at Sacramento, California

Filed – May 29, 2015

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Robert S. Bardwil, Bankruptcy Judge, Presiding

_____

Appearances:     Wiley Peteet Ramey, Jr. argued for appellant Glenn
                 Grego; Robert Joseph Schneider, Jr. argued for
                 appellee United States Trustee.

_____

Before: KURTZ, PAPPAS and JURY, Bankruptcy Judges.

----

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Glenn Grego appeals from the bankruptcy court's order sua sponte converting Grego's chapter 11[1] case to chapter 7. While we do not perceive any reversible error in the bankruptcy court's determination that Grego filed his petition in bad faith, the bankruptcy court should have considered dismissal of the chapter 11 case as an alternative to conversion.

Accordingly, we will VACATE the bankruptcy court's conversion order and will REMAND for consideration of dismissal as an alternative to conversion.

**FACTS**

Anxious about an impending foreclosure sale, Grego commenced a personal chapter 11 bankruptcy case on January 3, 2014. At the time of that bankruptcy filing, another related bankruptcy case already was pending in the Eastern District of California, a case filed by Grego as trustee for a trust formed by his father, who is deceased. The trust apparently owned 50% of the subject parcels of real property and Grego personally owned the other 50%. As Grego puts it, he needed to personally file bankruptcy because the trust's case was subject to dismissal based on an eligibility issue. Rather than contest the United States Trustee's motion to dismiss in the trust case, Grego decided that the better course of action was for him to commence a personal chapter 11 case.

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

2

This was not Grego's first personal bankruptcy case. In January 2011, he filed a personal chapter 11 case in the Central District of California. In April 2011, a chapter 11 trustee was appointed, and in February 2012 that case was converted to chapter 7. He ultimately received a chapter 7 discharge in the Central District case in September 2013. According to Grego, his interest in the real property never was administered in the Central District case.

Grego states that he felt pressured to commence his new chapter 11 case as soon as possible because the foreclosure sale was scheduled for one hour after the January 8, 2014 hearing on the United States Trustee's motion to dismiss the trust case. The trust case was dismissed by court order entered January 13, 2014, but Grego's new personal bankruptcy case already was pending.

Within days of Grego's new bankruptcy filing, the bankruptcy court issued what appears to be a routine order scheduling a chapter 11 status conference for roughly one month into the new bankruptcy case. A few days before the status conference, the bankruptcy court issued a three-page tentative ruling that was anything but routine. The court announced that it had a number of concerns about Grego's latest bankruptcy filing. The tentative ruling pointed out that there were a number of significant omissions and obvious inaccuracies in Grego's schedules. For instance, in Grego's Schedule A, he listed five parcels of real property and identified himself as "co-owner" but did not identify who else held an ownership interest in these properties. In a related problem, even though he identified each

3

of the properties as encumbered by deeds of trust, he did not identify the co-owner as a co-debtor on his Schedule H. Meanwhile, for every single category of personal property listed on his Schedule B, Grego checked the box stating "none," thereby indicating that he had no personal property at all. As for the declaration certifying the accuracy of all of Grego's "foregoing" bankruptcy schedules, the declaration was attached before rather than after the schedules, and the number of pages of schedules included was left blank, so Grego failed to properly certify the accuracy of any of his schedules.

Grego also filed Schedules I and J listing total monthly expenses of more than $17,000 and total monthly income of less than $4,000 – all derived from his four rental properties. The bankruptcy court noted that, assuming the accuracy of the income and expense schedules and the accuracy of Grego's representation that he did not expect either his income or his expenses to change in the next year, Grego did not have anywhere close to enough cash flow to cover the $8,300 in monthly living expenses incurred by him and his dependent daughter, let alone enough to fund a chapter 11 plan.

Grego also filed a statement of financial affairs, but the bankruptcy court once again was concerned about obvious inaccuracies and omissions. With the exception of rental income from Grego's four rental properties, which he listed in his answer to question one on his statement, Grego answered "none" to every other question in the statement. In addition, there were mathematical errors in Grego's current monthly income statement, and his credit counseling statement alleged that he had completed

4

the required credit counseling course but failed to attach the required credit counseling certificate.

The bankruptcy court also expressed concern about Grego's status conference report, in which he stated that he hoped to survive on his rental income while he litigated with his secured lender in state court over the lender's alleged predatory lending practices – a lawsuit he indicated that he recently had commenced. Among other things, the court noted that Grego's status conference report referenced his intent to use his lender's cash collateral and to seek compensation for managing his rental properties but that Grego had not yet filed any motion seeking court approval for either activity.

Based on these and other concerns, the tentative ruling stated that the court was inclined to continue the chapter 11 status conference but that the court was "not likely to permit [Grego] to delay the prosecution of this chapter 11 case for any significant length of time." Tent. Ruling. (February 2014) at pp. 1-3.

After issuance of the tentative ruling but before the status conference, Grego filed amended schedules and an amended statement of financial affairs. In his amended Schedule B, Grego now listed at least some personal property, including miscellaneous jewelry of $1,500 and a 2014 Ford Focus with a value of $27,000. Whereas his initial Schedule F listed no unsecured creditors, his amended Schedule F listed roughly fifty unsecured creditors holding in aggregate over $3 million in

claims.[2]  In addition, whereas his initial Schedule G listed no executory contracts or unexpired leases, his amended Schedule G disclosed his car lease (for the Ford Focus) as well as the four tenants who were leasing his rental properties.  In his amended Schedule H, Grego disclosed for the first time the trust as co-debtor.  As for his amended statement of financial affairs, Grego still answered "none" for most of the questions.  He did disclose four lawsuits in which he was involved in answer to question 4, but his lawsuit against his lender for predatory lending practices was not listed among them.

At the February 5, 2014 status conference, the bankruptcy court reiterated many of the same concerns stated in its tentative ruling and indicated that the filing of the amended schedules only increased rather than decreased those concerns. The court further pointed out that Grego did not disclose with his initial schedules his Central District bankruptcy case or the trust's bankruptcy case.[3]  The court also noted that there was no change to Grego's income and expense schedules showing negative net income of over $13,700 per month.

Based on all of the concerns expressed in the tentative ruling and at the hearing, the court stated numerous times that

[2]At the chapter 11 status conference, Grego indicated that, out of an abundance of caution, he had listed in his amended Schedule F all of the unsecured creditors from the Central District case, even though their claims presumably were discharged in that case.

[3]While Grego did not disclose the Central District case or the trust case when he filed his initial schedules on January 3, 2014, he did disclose both cases when he filed his statement of related cases on January 14, 2014.

6

Grego's chapter 11 petition either was filed in bad faith or as the result of gross incompetence. In his defense, Grego argued that it was inadvertent that he did not list any personal property and that he did not see the tentative ruling before filing the amended schedules. In response, the bankruptcy court clarified that the lynchpin for its bad faith or gross incompetence finding was the discrepancy between the schedules and Grego's egregious and complete disregard of the requirement to file accurate and complete schedules under oath. The following statement by the court sums up the court's comments at the status conference:

> All right. I listened to what you said. Nothing dissuades me. The fact that there was the threat of a foreclosure, it's done on a very, very routine basis where a petition is filed and schedules are not filed for two weeks, or even [longer] if an application to extend time is given.
>
> But the discrepancy between the initial petition and the amended schedules, which were filed after the court issued its tentative ruling identifying all of the faults and problems is, in the court's eye, one of two things. It's either a complete disregard for the requirements to file documents under oath and bad faith, or alternatively, the result of gross incompetence.
>
> Either way, . . . with those considerations, coupled with the prior bankruptcy that was not listed on this petition, and the prior Chapter 11 that was dismissed very recently, that you say is almost the same as the debtor here, leads me to conclude that there is absolutely sufficient cause to either appoint a Chapter 7, excuse me, a Chapter 11 trustee or convert the case to Chapter 7.

Hr'g Tr. (Feb 5, 2014) at 7:10-8:4.

In addition to announcing that its tentative ruling would become its final ruling, the bankruptcy court asked counsel for the United States Trustee whether the best interest of creditors

7

would be better served by the appointment of a chapter 11 trustee or the conversion of the case to chapter 7. Counsel for the United States Trustee responded that, given his familiarity with the trust case, and given that there appeared to be nothing to reorganize, conversion to chapter 7 likely was the better choice. According to counsel, all of Grego's parcels of real property were "under water." It is unclear exactly what the United States Trustee's counsel was basing this assessment on. Indeed, Grego's schedules were consistent on one point if nothing else: the value of his real property and the amount of debt secured thereby. At all times, the schedules indicated that there was at least some equity in at least some of the parcels of real property. Even more strangely, the bankruptcy court apparently did not consider the option of dismissing the case even though there did not appear to be much in the way of unencumbered nonexempt assets to administer under either set of schedules.

On February 6, 2014, the bankruptcy court entered its order converting the case to chapter 7. Grego timely filed his notice of appeal on February 7, 2014.

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

### ISSUE

Did the bankruptcy court abuse its discretion when it converted Grego's chapter 11 bankruptcy case to chapter 7?

### STANDARDS OF REVIEW

We review the bankruptcy court's order converting Grego's

8

chapter 11 case to chapter 7 for an abuse of discretion. Pioneer Liquidating Corp. v. U.S. Trustee (In re Consol. Pioneer Mortg. Entities), 264 F.3d 803, 806 (9th Cir. 2001).

The bankruptcy court abuses its discretion when it applies an incorrect legal standard or when its findings are illogical, implausible or without support in the record. See United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

**DISCUSSION**

Under § 1112(b)(1), when the court finds "cause" to dismiss or convert a chapter 11 case, the court must decide which of several court actions will best serve the estate's creditors. It must:

> (1) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate; and (2) identify whether there are unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate.

Sullivan v. Harnisch (In re Sullivan), 522 B.R. 604, 612 (9th Cir. BAP 2014).

Here, the bankruptcy court found that there was cause to convert on two alternate grounds: (1) gross incompetence, or (2) Grego's petition was filed in bad faith. Section 1112(b)(4) enumerates sixteen non-exclusive grounds that constitute cause for dismissal. Gross incompetence is not among them, but gross mismanagement of the estate is. See § 1112(b)(4)(B). On appeal, the United States Trustee contends that, by stating that Grego (or his counsel) had been grossly incompetent, the court meant to find that cause existed under § 1112(b)(4)(F): "[an] unexcused failure to satisfy timely any filing or reporting requirement

9

established by this title or by any rule applicable to a case under this chapter." We are not persuaded by the United States Trustee's contention. The bankruptcy case was not much more than one month old, and the bankruptcy court did not identify any filing or reporting requirement Grego had failed to timely comply with. To the contrary, the court suggested that, instead of filing inaccurate and incomplete schedules, Grego should have held off on filing any schedules until he could have provided correct and substantially complete information. Thus, we conclude that the bankruptcy court's finding of cause was not meant to invoke § 1112(b)(4)(F).

While the bankruptcy court used the term gross incompetence instead of gross mismanagement, we believe that the court meant to invoke § 1112(b)(4)(B). None of the other enumerated types of cause comes closer to fitting the court's comments, and if the court had meant to identify its own unique category of cause for dismissal or conversion, we presume the court would have elaborated on the new category it was articulating. The court did not attempt to offer any such elaboration.

The bankruptcy court's finding of cause under § 1112(b)(4)(B) is problematic. The § 1112(b)(4)(B) inquiry typically focuses on how the debtor or the debtor's agents have managed the estate's assets or business during the pendency of the chapter 11 proceeding and how they have reported and handled, postpetition, income and expenses derived from the assets/business. See, e.g., In re McTiernan, 519 B.R. 860, 866-67 (Bankr. D. Wyo. 2014); In re Fall, 405 B.R. 863, 868 (Bankr. N.D. Ohio 2009) aff'd sub nom. Fall v. Farmers &

10

Merchants State Bank, 2009 WL 974538 (N.D. Ohio Apr. 9, 2009); see also In re Prods. Int'l Co., 395 B.R. 101, 111 (Bankr. D. Ariz. 2008) (listing additional cases).

Here, there is no evidence in the record regarding Grego's postpetition management of his bankruptcy estate's real property assets, nor did the court identify postpetition management or postpetition reporting of income and expenses as one of its concerns. In fact, given that the bankruptcy case was roughly one month old, and given the complete absence of any evidence in the record, the bankruptcy court was in a poor position to make any material findings regarding postpetition management and reporting.

We do not mean to imply that the term "gross mismanagement of estate assets" as used in § 1112(b)(4)(B) should be given a narrow or limited meaning. As the cases cited above indicate, the term covers a broad range of postpetition activity affecting the estate's assets, income, expenses and reporting. Nonetheless, no matter how broad the term is construed, we think it requires more than a finding that the debtor initially filed inaccurate and incomplete schedules and an inaccurate and incomplete statement of financial affairs.

Because the bankruptcy court's findings of cause did not correctly invoke § 1112(b)(4)(B), we turn to the bankruptcy court's alternate grounds for finding cause – its determination that Grego filed his petition in bad faith.

While not enumerated in § 1112(b)(4), the bad faith filing of a bankruptcy petition is recognized as cause for dismissal or conversion. Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828

11

(9th Cir. 1994); In re Sullivan, 522 B.R. at 614. In seeking to determine whether the petition was filed in good faith, "the debtor's subjective intent is not determinative." In re Marsch, 36 F.3d at 828. Rather, the good faith inquiry focuses on the manifest purpose of the petition filing and whether the debtor is seeking to achieve thereby "objectives outside the legitimate scope of the bankruptcy laws." Id.

Put another way, a bankruptcy court making a finding regarding whether a chapter 11 petition was filed in good faith must ascertain "whether [the] debtor is attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." Id. (citing Idaho Dep't of Lands v. Arnold (In re Arnold), 806 F.2d 937, 939 (9th Cir. 1986)).

In making the good faith determination, the bankruptcy court typically must consider an amalgam of factors, instead of relying on a single dispositive fact. Id. At the same time, the determination is to be made on a case by case basis, and there is no talismanic list of factors that must be present in each case in order to find bad faith; the weight given to any particular factor depends on all of the circumstances of the individual case. Laguna Assocs. Ltd. P'ship v. Aetna Casualty & Sur. Co. (In re Laguna Assocs. Ltd. P'ship), 30 F.3d 734, 738 (6th Cir. 1994); see also de la Salle v. U.S. Bank, N.A. (In re de la Salle), 461 B.R. 593, 605 (9th Cir. BAP 2011) (holding that, in chapter 13 cases, bankruptcy courts must consider the "totality of the circumstances" before making a bad faith determination).

That being said, bankruptcy courts typically look for and

12

find more than one of the following factors before making a finding of bad faith in a chapter 11 case:

> (1) the debtor has one asset;
> (2) the pre-petition conduct of the debtor has been improper;
> (3) there are only a few unsecured creditors;
> (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
> (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
> (6) the filing of the petition effectively allows the debtor to evade court orders;
> (7) the debtor has no ongoing business or employees; and
> (8) the lack of possibility of reorganization.

In re Laguna Assocs. Ltd. P'ship, 30 F.3d at 738 (citing Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068, 1072 (5th Cir. 1986)). Accord, Can-Alta Props., Ltd. v. State Sav. Mortg. Co. (In re Can-Alta Props., Ltd.), 87 B.R. 89, 91 (9th Cir. BAP 1988).

In addition, the factors typically found in bad faith chapter 13 bankruptcy filings can be instructive in assessing good faith in personal chapter 11 bankruptcy cases.[4] In chapter 13 cases, the bankruptcy courts typically look for the following:

> (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat

---

[4]We have observed that, because the provisions governing dismissal or conversion of chapter 13 and chapter 11 cases are similar, cases under one chapter often are helpful in resolving cases under the other chapter. See Nelson v. Meyer (In re Nelson), 343 B.R. 671, 674-75 (9th Cir. BAP 2006).

13

state court litigation; and (4) whether egregious behavior is present.

Ellsworth v. Lifescape Med. Assocs. (In re Ellsworth), 455 B.R. 904, 917-18 (9th Cir. BAP 2011).

Here, in spite of the thin evidentiary record, Grego's prior and current filings patently demonstrate the existence of a number of the typical bad faith factors. Grego had virtually no personal property and only five parcels of real property, all of which were heavily encumbered. Prior to Grego's latest filing, in 2011, he had filed a personal chapter 11 case in which a chapter 11 trustee was appointed, and that case ultimately was converted to chapter 7. Meanwhile, he also filed a case on behalf of a trust established by his deceased father, which case was dismissed based on the trust's lack of eligibility to be a debtor. Grego listed in his amended schedules roughly fifty unsecured creditors holding millions of dollars in claims, but admitted at the chapter 11 status conference that most or all of these claims were discharged in his prior chapter 7 case, thereby leaving him with little or no unsecured debt. Grego also admitted at the status conference (and in his appeal brief) that he felt pressured to file his new bankruptcy case because of an imminent foreclosure sale. Other than his rental property, Grego has no ongoing business and no employees.

While the above factors, by themselves, might indicate a bad faith filing, there were three other factors evident that are of even greater concern. The prospects for reorganization appeared extremely slim at best given Grego's admission of over $13,000 in negative monthly cash flow and in light of the history of Grego's

14

unsuccessful chapter 11 bankruptcy filings (both for himself and on behalf of the trust). Most importantly, the court found that Grego's initial schedules and statement of financial affairs contained many inaccuracies and omissions and that the filing of those documents under oath was egregious.

We cannot disagree with any of these findings. Grego argues that the omissions and inaccuracies in his initial filings can largely be explained (and perhaps excused) by the pressure he felt given the impending foreclosure proceedings and by the fact that he filed amended schedules and an amended statement of financial affairs within days of his filing the original documents. However, we agree with the bankruptcy court that there was no excuse for filing these documents under oath knowing that they were inaccurate and incomplete or with complete disregard for their accuracy and completeness. Grego knew by no later than December 23, 2013, when he filed a non-opposition to the United States Trustee's motion to dismiss his trust case, that he would be filing a new personal chapter 11 case. Grego never has offered any legitimate explanation why he could not have filed accurate and complete documents in support of his January 2014 chapter 11 bankruptcy filing either at the time of that filing or shortly thereafter.

Our bankruptcy system is dependent upon accurate, timely and complete self-reporting by debtors in their schedules, in their statements of financial affairs, and in their other filings. See Cusano v. Klein, 264 F.3d 936, 945-946 (9th Cir. 2001); Cheng v. K & S Diversified Invs., Inc. (In re Cheng), 308 B.R. 448, 458 (9th Cir. BAP 2004). Consequently, Grego's filing of his initial

15

documents knowing them to be inaccurate and incomplete or without regard to their accuracy and completeness is of grave concern to us. In short, we perceive no reversible error in the bankruptcy court's bad faith findings.

Grego has asserted, on appeal, that this Panel should reverse the bankruptcy court's ruling in its entirety because the bankruptcy court disregarded his due process rights by converting the case sua sponte at the status conference. We disagree. The bankruptcy court had the authority under § 105(a) to sua sponte consider dismissal or conversion. See Rosson v. Fitzgerald (In re Rosson), 545 F.3d 764, 774-75 (9th Cir. 2008); Tennant v. Rojas (In re Tennant), 318 B.R. 860, 869-70 (9th Cir. BAP 2004). Furthermore, if Grego truly believed that he needed a better opportunity to respond to the bankruptcy court's concerns, he should have raised the issue in the bankruptcy court, but he did not do so. See Rains v. Flinn (In re Rains), 428 F.3d 893, 902 (9th Cir. 2005). Moreover, in this instance, any due process error was harmless. There is nothing in Grego's bankruptcy court papers or in his appeal papers indicating that, if given further opportunity, the factors pertinent to the bad faith determination could or would materially change. See In re Rosson, 545 F.3d at 774-75.

The only other issue we must address is whether the court committed reversible error by not considering dismissal as an alternative to conversion. Recall that we noted at the outset of this discussion that a bankruptcy court finding "cause" within the meaning of § 1112(b) needs to consider whether to dismiss, convert, or appoint a trustee or examiner, or whether unusual

16

circumstances exist militating against any of the above-referenced court actions (from the perspective of the estate's creditors). In re Sullivan, 522 B.R. at 612. Here, the bankruptcy court did not consider dismissal. While we recently stated in an unpublished decision that the debtor may forfeit this issue by not raising it either in the bankruptcy court or on appeal, Kenny G Enters., LLC v. Casey (In re Kenny G Enters., LLC), 2014 WL 4100429, at *12 (9th Cir. BAP Aug. 20, 2014), we also have stated recently, in a published opinion:

> [R]egardless of the parties' arguments, the bankruptcy court [has] an independent obligation under § 1112 to consider what would happen to all creditors on dismissal and, in light of its analysis, whether dismissal or conversion would be in the best interest of all creditors . . . .

In re Sullivan, 522 B.R. at 612-13.

That the bankruptcy court here did not consider whether dismissal was in the best interests of creditors troubles us for three reasons. First, Grego's secured creditor(s) received no advance warning that the court actually would consider conversion and/or dismissal at the status conference. As a result, the secured creditor(s) likely were deprived of any meaningful opportunity to appear and be heard on the issue.[5]

---

[5]The United States Trustee pointed out during oral argument that the status conference order, which was served on at least some of Grego's creditors on January 17, 2014, stated that the court might dismiss or convert the case if Grego did not comply with the status conference order. However, the bankruptcy docket reflects that Grego substantially complied with the status conference order, so the creditor(s) had no reason to suspect that the court had actual grounds to consider either dismissal or conversion at the status conference.

17

Second, the record suggests that Grego had almost no unsecured creditors and almost no unencumbered nonexempt assets, thus indicating that there would be little or no chapter 7 estate to administer and no unsecured creditor body to administer the estate on behalf of. And third, Grego did have one or more secured creditors, who might have preferred dismissal over conversion, so that they could proceed immediately with their state court remedies.

Under these circumstances, and in light of our holding in In re Sullivan, we must VACATE the bankruptcy court's conversion order and REMAND for consideration of whether conversion or dismissal is in the best interests of the estate's creditors, and whether there exist any unusual circumstances militating against both conversion and dismissal (from the perspective of the estate's creditors). We express no opinion regarding how, on remand, the bankruptcy court should address these issues, but we do note that the bankruptcy court, if it deems it appropriate, may require that notice be given to interested parties, and may decide either to reopen the record or to make additional findings based on the existing record.

**CONCLUSION**

For the reasons set forth above, we VACATE the court's conversion order, and we REMAND for further proceedings consistent with this Panel's decision.

18