**IN RE: PREMIER GOLF
PROPERTIES, LP,
Debtor.**

**BANKRUPTCY NO. 15–01068–CL11**

United States Bankruptcy Court,
S.D. California.

Date of Hearing: 08/22/2016, Time
of Hearing: 2:30 p.m.

Signed 08/23/2016

Darvy Mack Cohan, Darvy Mack Cohan, La Jolla, CA, Jack Fitzmaurice, Fitzmaurice & Demergian, Chula Vista, CA, for Debtor.

Garrick A. Hollander, Peter W. Lianides, Winthrop Couchot, P.C., Newport Beach, CA, Richard M. Kipperman, La Mesa, CA, for Trustee.

Haeji Hong, Office of the US Trustee, San Diego, CA, for United States Trustee.

## ORDER CONVERTING CASE TO CHAPTER 7

Christopher B. Latham, Judge, United States Bankruptcy Court

IT IS HEREBY ORDERED as set forth on the continuation page(s) attached, numbered two (2) through nineteen (19).

The court has considered Cottonwood Cajon ES, LLC's ("Cottonwood Cajon") motion for relief from stay, or alternatively to dismiss case, Premier Golf Properties, LP's ("Debtor") opposition, Cottonwood Cajon's reply, the United States Trustee's (the "UST") limited response, the respective supporting evidence, and the parties' oral argument at the hearing on this matter. For the following reasons, the court

**grants** the motion in part, **converts** the case to Chapter 7, and **denies** without prejudice Cottonwood Cajon's stay relief request.

## Factual Background and Procedural History

*Debtor, Far East National Bank, Cottonwood Cajon, the Settlement Agreements, and Debtor's Two Bankruptcy Cases*

The parties are familiar with the material facts. Debtor owns and operates a golf course and related concerns in Rancho San Diego. On December 21, 2007, Debtor gave Far East National Bank ("FENB") an $11.5 million promissory note. On December 24, 2007, the parties entered into a loan agreement evidencing the promissory note and underlying obligation (the "Loan Agreement"). Henry Gamboa ("Mr. Gamboa") personally guaranteed the loan, promissory note, and the Loan Agreement. A first position trust deed secures Debtor's obligations under the Loan Agreement and promissory note. On December 24, 2007, as additional security for the loan, the parties executed a security agreement in FENB's favor (the "Security Agreement"). Under the Security Agreement's terms, all of Debtor's present and future obligations owed to FENB are secured by all of its present and after-acquired personal property. The Loan Agreement's original maturity date was December 26, 2009, but a February 1, 2010 amendment extended it to March 24, 2010.

On March 25, 2010, Debtor defaulted under the Loan Agreement by, among other things, failing to repay the entire outstanding balance by the maturity date. FENB then took steps to foreclose on the property. On January 28, 2011, Debtor responded by bringing a complaint against FENB in San Diego County Superior Court (Case No. 37–2011–00065341–CU–BT–EC) seeking an injunction preventing FENB from foreclosing (the "State Court Action").

Debtor's long and tortuous bankruptcy history began when it submitted a voluntary Chapter 11 petition on May 2, 2011 (Case No. 11–07388–PB11) (the "First Bankruptcy Case"). On April 16, 2012, after receiving stay relief, FENB responded with a cross-complaint against Mr. Gamboa for breach of the guaranty.

The First Bankruptcy Case remained pending for slightly under three years before its March 26, 2014 dismissal, but Debtor never confirmed a plan. The case was dismissed by a March 18, 2014 stipulation between Debtor and FENB. But the decision to dismiss arose from a December 23, 2013 Settlement and Release Agreement (the "First Settlement Agreement"). In relevant part, the First Settlement Agreement states that Debtor defaulted under the Loan Agreement on March 25, 2010 by, *inter alia*, failing to repay the entire outstanding balance of the loan upon maturity. In addition, the total amount that Debtor owed FENB as of November 18, 2013 was $15,379,362.49. As part of the settlement, the parties agreed that: (1) Debtor would dismiss with prejudice both the State Court Action and the First Bankruptcy Case; (2) upon occurrence of certain conditions—including Debtor bringing property taxes current and beginning monthly payments to FENB—FENB would: (1) dismiss with prejudice its cross-complaint against Mr. Gamboa; and (b) rescind the previously recorded notice of default and election o sell under the trust deed.

Shortly thereafter, Debtor dismissed both the State Court Action and the First Bankruptcy Case, and started making $42,500 monthly interest-only payments. And in January 2014, it began seeking subordinate financing to cover the $1.7 million property tax liability due by March

23, 2014 under the First Settlement Agreement. The parties have briefed this issue extensively, and a fuller discussion of what happened can be found in the court's: (1) February 19, 2015 Order on Objection to Claim No. 10 of Cottonwood Cajon ES, LLC (the "First Claim Objection Order"); and (2) May 27, 2016 Order Overruling Debtor's Objection to Claim No. 10 of Cottonwood Cajon ES, LLC (the "Second Claim Objection Order"), which the court incorporates by reference here as appropriate.

Suffice it to say, Debtor secured a written conditional loan commitment from Advant Mortgage LLC dba MVP Mortgage ("MVP") on March 25, 2014—two days after the tax payment deadline. Debtor intended to use the loan proceeds primarily to pay the delinquent property taxes. In exchange, it would give MVP a second position trust deed on its real and personal property. The funding obligation was subject to at least 20 conditions precedent that Debtor had to satisfy by a date certain.

Debtor believed that the Loan Agreement required FENB's consent to record a junior lien. Instead of consenting, however, FENB sent Debtor a notice of default for failure to meet the tax payment deadline. MVP eventually withdrew the funding. After that, Debtor continued making monthly payments. FENB issued a second default letter on August 14, 2014, again noting Debtor's failure to pay the taxes on time. This time, however, FENB returned Debtor's August 2014 payment and stated its intention to proceed with its rights and remedies under the First Settlement Agreement and other loan documents. Because FENB then sought foreclosure, Debtor reentered bankruptcy with the present voluntary Chapter 11 petition on February 24, 2015.

On its petition, Debtor describes itself as a partnership and golf course. It is not a single asset real estate or small business. And its debts are primarily business debts (ECF No. 1). Debtor originally disclosed $44,363,923.69 in assets and $19,228,427.85 in liabilities (ECF No. 19–1, p. 1). In relevant part, Schedule A lists Debtor's real property—3121 Willow Glen Drive, Rancho San Diego, CA 92019—as having a $44 million value, encumbered by $16,269,150.89 in secured claims. *Id.* at p. 3. Personal property listed on Schedule B includes: (1) $42,560.54 in various financial accounts; (2) $73,000 in stock and interests in incorporated and unincorporated businesses; (3) $44,581.59 in accounts receivable; (4) $35,989.31 in machinery, equipment, and other supplies used in business; (5) $24,496.88 in inventory; (6) $143,295.37 in other personal property; and (7) a contingent or unliquidated claim against FENB of unknown value, for a total of $363,923.69 in personal property. *Id.* at pp. 4–10; ECF No. 43–1. Debtor claims no property as exempt on Schedule C. *Id.* at p. 11. Schedule D lists four secured creditors: (1) Cottonwood Cajon's $16,269,150.89 claim secured by the real property; (2) $2,459,431 owed to San Diego County Treasurer–Tax Collector for property taxes; (3) $36,636 owed to RBHB Golf Cart LLC for a golf carts lease; and (4) a $52,232.70 judgment debt owed to Christine Brewer. *Id.* at p. 12; ECF No. 42–1; ECF No. 46–1. A December 11, 2015 amendment reduced Cottonwood Cajon's claim to $8.5 million (ECF No. 152).

Schedule E reveals a $111,239 debt owed to the Internal Revenue Service, $100,063.13 of which is entitled to priority. *Id.* at p. 15. Schedule F originally disclosed over 60 creditors holding $299,738.26 in unsecured claims. *Id.* at pp. 16–25. An April 13, 2015 amendment added various creditors to increase that amount to $2,347,421.75 in unsecured claims (ECF No. 56–1).

On February 10, 2015, FEBN assigned the note and trust deed to Cottonwood Cajon. On May 14, 2015, Cottonwood Cajon filed proof of claim no. 10–1 in the secured amount of $16,428,631.60, which includes a $5,554,020.81 arrearage (the "Claim"). There are 15 filed claims in this case totaling $20,899,460.49; about 78.6% of that is owed to Cottonwood Cajon.

### The Present Case

This case has not proceeded in the normal course, to say the least. It boasts 339 docket entries and has seen waves of complex motion practice between Debtor and Cottonwood Cajon. The following history is relevant to the present dispute.

Trouble began on July 17, 2015, when Debtor moved to voluntarily dismiss the case (ECF No. 79). Like the First Bankruptcy Case, a July 10, 2015 Forbearance and Settlement Agreement (the "Second Settlement Agreement") with Cottonwood Cajon motivated Debtor to do so. But it withdrew that request on August 25, 2015 because its financing arrangements failed in mid–August 2015. As a result, Debtor could not go forward with the Second Settlement Agreement since, without financing, it would be unable to make the $6.5 million interim payment due Cottonwood Cajon under the agreement. And failure to make that payment would have triggered immediate foreclosure, extinguishing more than $2.4 million of junior unsecured debt and some $10,000,000 of equity interests (ECF No. 87).

This drew both an emergency objection (ECF No. 88) and standalone § 1112(b) motion to dismiss (ECF No. 94). That motion set forth arguments similar to those now before the court, including that: (1) this is a two-party dispute; (2) this is a bad faith serial filing designed to frustrate Cottonwood Cajon's rights under both settlement agreements; (3) Debtor cannot confirm a Chapter 11 plan because it is bound by the Second Settlement Agreement's terms (with or without court approval); and (4) Debtor engaged in other misconduct, such as making unauthorized post-petition transfers, issuing inaccurate monthly operating reports, and defaulting on its monthly debt service obligations to Cottonwood Cajon.

The court ultimately found the Second Settlement Agreement unenforceable under *A & C Properties* and public policy considerations. Importantly, it also determined that, under the totality of the facts and circumstances, Debtor did not file this case in bad faith. And in reaching that conclusion, it expressly stated that it was not convinced this is a two-party dispute. Several other indicia of bad faith were also lacking.

On October 9, 2015, Debtor submitted its disclosure statement (ECF No. 116), which it revised on November 6, 2015 (ECF No. 136). On October 12, 2015, Debtor filed its initial joint Chapter 11 plan (ECF No. 119) (the "Initial Plan"). The Initial Plan treated the Claim as unimpaired in Class 2. It proposed paying Cottonwood Cajon, on the effective date, "all arrearages under the Settlement Agreement consisting of monthly interest payments in the amount of $42,500 that came due before the Petition Date." In addition, it offered to use §§ 1123(a) and 1124(2) to cure and reinstate all Debtor's obligations under the First Settlement Agreement, including restoration of the $8.5 million reduced principal balance that agreement called for. Both Cottonwood Cajon and the UST objected. Cottonwood Cajon argued that the disclosure statement did not: (1) accurately describe the Claim given Debtor's inability to reinstate the First Settlement Agreement; or (2) provide sufficient information about the proposed equity infusion, namely the identify of the funds' source.

On December 3, 2015, the court disapproved the disclosure statement. And it stated:

- Debtor is to be prepared, after the continued hearing on 1/29/16, to shortly thereafter file the next version of disclosure statement w/its intended proposed plan;
- When there is another version, Debtor is directed to remedy deficiencies discussed on the record at the 12/3/15 hearing and meet & confer w/opposing counsel on their separate objections;
- Debtor's counsel represents that there are at least 2 providers of capital, possibly, interested in doing business w/Debtor. Those need to be disclosed in next version of plan/disclosure statement.

*See* Court's Minute Order (ECF No. 146).

Debtor then brought two separate objections to the Claim on December 11, 2015 (ECF Nos. 153, 154, 155, and 160) and March 4, 2016 (ECF Nos. 190, 191, 192, and 193). As the parties are aware, Debtor sought to partially invalidate the Claim under both bankruptcy and nonbankruptcy law principles. Months of rigorous litigation culminated in the First and Second Claim Objection Orders, both of which went against Debtor's position. Those decisions are now on appeal in the District Court.

The court held a status conference on March 2, 2016. It directed Debtor to file and notice out its next plan and disclosure statement by April 1, 2016. And the court again required Debtor to address the various deficiencies discussed at the December 3, 2015 hearing. The parties also discussed extensively the need for Debtor to disclose its investors (ECF No. 198).

On March 24, 2016, Debtor sought to extend the April 1, 2016 deadline because:

(1) Mr. Gamboa was contemplating bankruptcy and, if filed, would seek administrative or substantive consolidation; and (2) the claim objections' outcomes could impact the disclosure statement (ECF No. 201) (the "First Extension Request"). To date, Mr. Gamboa has not filed bankruptcy.

On May 17, 2016, Cottonwood Cajon filed a status report (ECF No. 218). It stated that: (1) it had received no payments since the petition date; (2) as of April 30, 2016, Debtor had $3,105,257 in outstanding property taxes and was not paying them post-petition; (3) seven months had passed since Debtor last filed a plan or disclosure statement; and (4) Debtor provided no evidence of investors willing to provide exit financing to fund its plan. At the May 18, 2016 status conference, the UST also voiced concern over Debtor continuing in Chapter 11 given its failure keep current its tax obligations (ECF No. 222).

On May 23, 2016, Debtor brought an emergency motion for: (1) an order to show cause why Ronald Richards ("Mr. Richards") should not be held in contempt for an alleged automatic stay violation; (2) sanctions; (3) attorneys' fees and costs; and (4) acknowledgment that Lehigh Hanson, A–1 Soils Division ("Hanson") could engage in business with Debtor in the ordinary course (ECF No. 219). In that motion, Debtor admitted that it contracted with Hanson in April 2016 to excavate and haul away valuable sand as part of its lake construction project. In return, Hanson paid Debtor for the sand—an arrangement to mitigate Debtor's lost revenue during the project. But Mr. Richards allegedly interfered with the parties' contract by contacting Hanson directly and informing it that Cottonwood Cajon, not Debtor, owned the sand. As a result, Hanson ceased work on the project, refused to pay

Debtor over $150,000 in receivables, and asked for court authorization to continue the project.

The emergency motion gave rise to both an emergency status report (ECF No. 221) and objection (ECF No. 225) from Cottonwood Cajon. It argued that it holds a security interest in substantially all of Debtor's assets, including minerals and sand. It believed that Debtor—without Cottonwood Cajon's or the court's consent—sold sand to Hanson, G & D Materials, LLC ("G & D") and possibly others outside the ordinary course of business. The proceeds of those sales are Cottonwood Cajon's cash collateral. And Debtor never obtained Cottonwood Cajon's or the court's permission to use cash collateral or sell the sand free and clear of Cottonwood Cajon's security interest.

On May 25, 2016, the court held a hearing on Debtor's emergency motion (ECF No. 226). The next day, it entered an interim order based on the parties' arguments and its oral findings articulated from the bench (ECF No. 227) (the "Interim Cash Collateral Order"). In relevant part, that order states:

> As discussed at the May 25, 2016 hearing, the court is concerned that Debtor has been selling estate property subject to Cottonwood Cajon's security interest—both without Cottonwood Cajon or the court's authorization and possibly outside the ordinary course of business. In addition, it may be spending sale proceeds comprising Cottonwood Cajon's cash collateral instead of segregating those funds in a separate account. For the time being, the parties should treat any future sums that Hanson or G & D Materials, LLC ("G & D") pays to Debtor for soil sales as presumptively cash collateral.
>
> That being said, if Debtor wishes to spend any of Cottonwood Cajon's cash collateral, it must first bring a motion for permission. It may not otherwise spend or use any of it without court authorization.
>
> In the meantime, Hanson is authorized to: (1) finish hauling away the soil or sand that has already been excavated from the Ivanhoe Course; (2) pay Debtor the roughly $153,000 it owes for prior work; and (3) continue performing under the current contract (estimated to last six more weeks), including paying the balance due for any remaining excavation and exportation work.
>
> Debtor is directed to place all sums received from Hanson, G & D, and any other contractor in a segregated account created for that purpose. It is not to remove or expend those funds without court authorization. Once Hanson fulfills its contractual obligations, Debtor is not to enter into further agreements for future excavation or improvement projects on the property without leave of court obtained through appropriate motion . . . .

The Interim Cash Collateral Order at pp. 2–3. On June 14, 2016, after missing the emergency motion deadline, Debtor moved for permission to use of cash collateral (ECF Nos. 244, 245, and 246) (the "Cash Collateral Motion"). In that motion, Debtor reiterated several arguments—and provided substantial testimonial evidence—that it has made for many months now, viz.: (1) it is not engaging in mineral/sand mining for economic gain in order to use Cottonwood Cajon's cash collateral or reduce its security; and (2) any work on the golf course is in the ordinary course and has improved Cottonwood Cajon's collateral position. Cottonwood Cajon attacked this request on various grounds (ECF No. 270). The court has not yet ruled on the Cash Collateral Motion.

On June 17, 2016, Debtor submitted a second ex parte motion to extend the deadline to file its disclosure statement given technical issues at its counsel's office (ECF No. 253) (the "Second Extension Request"). The court granted that request on June 22, 2016, allowing Debtor until July 3, 2016 to file its disclosure statement (ECF No. 257). But it also noted that, given Cottonwood Cajon's objection, if Debtor failed to meet its deadlines then the court could consider it cause to convert or dismiss.

On June 28, 2016, the court directed Debtor to appear for a Rule 2004 examination and produce various documents pertaining to its current and intended funding options for its Chapter 11 plan (ECF No. 269) (the "Rule 2004 Order").

On July 3, 2016, Debtor filed its restructured disclosure statement (ECF No. 275) (the "Restructured Disclosure Statement"). In relevant part, the Restructured Disclosure Statement reveals that the plan's funding will come from a "New Value Contribution" of no less than $20.5 million by Debtor's "Capital Partner," and Debtor's operating income. The Restructured Disclosure Statement at pp. 31 and 38. In exchange, the Capital Partner will receive equity in Debtor and a first position trust deed securing a portion of the contribution. *Id.* The Capital Partner is not identified.

Finally, on July 20, 2016, Debtor's counsel submitted a statement of error and fault regarding cash collateral (ECF No. 297) (the "Statement of Fault"). He admits that he misread the Interim Cash Collateral Order by informing Debtor that: (1) it should complete the current lakes excavations project and place the Hanson funds, once received, into a segregated account; and (2) it could then use those monies for the limited purpose of completing the lakes. Debtor has used its receivables for that purpose. Debtor's counsel concedes that the Interim Cash Collateral Order does not authorize Debtor to use any money received from Hanson.

### Cottonwood Cajon's Motion for Stay Relief, or Alternatively for Dismissal

Cottonwood Cajon now seeks stay relief under § 362(d)(1) to exercise its nonbankruptcy law rights and remedies, including foreclosing on Debtor's real and personal property. Alternatively, it requests the case's dismissal with prejudice. And its reasons are plentiful.

As to stay relief, Cottonwood Cajon mainly argues that Debtor has not and cannot propose a feasible plan or reorganize, despite having had nearly 18 months to do so. It filed the Initial Plan and disclosure statement in October 2015, which drew objections by Cottonwood Cajon and the UST. In November 2015, Debtor filed a revised disclosure statement that Cottonwood Cajon again objected to, noting feasibility issues. In denying the revised disclosure statement, the court directed Debtor to disclose capital investors in the next version. After that, Debtor filed the First and Second Extension Requests for various reasons—which Cottonwood Cajon believes was a delay tactic. And the Restructured Disclosure Statement and plan continue to show that Debtor cannot propose a feasible plan. Indeed, no committed financial source supports the latest plan. It refers to an unidentified Capital Partner who will invest $20.5 million as a New Value Contribution. This contravenes the court's December 2015 order that Debtor disclose its potential investors.

In addition, Debtor has produced a July 1, 2006 letter of intent from an unidentified party. The letter refers to: (1) a purchase of the property for no more than $20.5 million; and (2) this case's dismissal. But it expressly states that it is a non-binding

agreement subject to a purchase and sale agreement to be later negotiated. There is no financial commitment for the sale, aside from a $100,000 refundable escrow deposit. In any event, the letter's terms conflict with the Restructured Disclosure Statement and plan—the latter of which calls for a $20.5 million New Value Contribution from a Capital Partner, not a sale followed by dismissal. The evidence plainly shows that Debtor does not have any financial commitment. It is using the automatic stay as merely a delay tactic.

Debtor has also failed to make any postpetition adequate protection payments to Cottonwood Cajon. The Claim continues to accrue $82,000 per month in default interest. The Claim's value now exceeds $18,289,332. And Cottonwood Cajon's equity cushion continues to decline because of Debtor's failure to pay its post-petition tax obligations, which now total more than $3 million and are accruing interest at an 18% per annum penalty rate. Debtor lacks the financial wherewithal to pay the taxes, let alone service its secured debt. Cottonwood Cajon thus contends that cause exists to lift the stay under § 362(d)(1).

Cottonwood Cajon offers a panoply of arguments for dismissal. First, Debtor is unable to confirm a plan in a timely fashion under §§ 1112(b)(2)(A) and (B). The Restructured Disclosure Statement, latest plan, letter of intent, and all previous confirmation attempts fail to show any committed financing to adequately address the Claim. Indeed, Debtor still refuses to disclose the potential investors' identities. Moreover, this is a classic two-party dispute because: (1) Cottonwood Cajon and Debtor are the only material parties; (2) the Claim totals $18,289,332 and Debtor has been unable to address it in 18 months; (3) Debtor effectively admitted it by seeking the case's dismissal under the Second Settlement Agreement; (4) the

outstanding property taxes will be paid upon the property's sale or disposition; (5) trade claims are *de minimis*; (6) the roughly $2 million in insiders claims—to the extent they exist—are out of the money; and (7) dismissal will not prejudice any other party.

Second, there is cause under § 1112(b)(4)(A). Debtor has failed to meaningfully address the Claim, despite having 18 months to do so. Cottonwood Cajon's collateral position continues to erode. And Debtor has no chance to propose a legitimate plan. All Debtor has is hope that financing may materialize sometime in the future. This is not a basis to remain in bankruptcy.

Third, Debtor has: (1) sold Cottonwood Cajon's collateral (the sand and soil) without approval; (2) used the proceeds without authorization; and (3) allowed some of the funds to be diverted to its principal's (Mr. Idler) personal account. Further, Debtor violated the court's Interim Cash Collateral Order by continuing to use cash collateral proceeds after the order's entry. These acts reduced Cottonwood Cajon's collateral position in the sand and soil and contravened § 363. In addition, it constitutes unauthorized use of cash collateral substantially harmful to one or more creditors and thus cause to dismiss under § 1112(b)(4)(D).

Fourth, Debtor's failure to keep current its post-petition property tax obligations is cause to dismiss under § 1112(b)(4)(I).

Fifth, Debtor has repeatedly violated court orders under § 1112(b)(4)(E). It received over $153,000 from Hanson in contravention of the Interim Cash Collateral Order. And it violated the Rule 2004 Order by failing to provide two requested document sets, despite promising to do so.

Finally, Cottonwood Cajon points to dilatory misconduct on Debtor's part as addi-

tional cause to dismiss. It entered the First Settlement Agreement with FENB—causing the First Bankruptcy Case's dismissal—and immediately defaulted. It then reentered bankruptcy to halt foreclosure. In the present case, it entered the Second Settlement Agreement with Cottonwood Cajon yet withdrew from it before its approval. In both instances, Debtor made settlement agreements with no financial ability to perform. Debtor's history shows that it uses bankruptcy "as both a shield and a sword." The litigation surrounding the Second Settlement Agreement's legitimacy, and Debtor's ability to withdraw from it, continued for months. After that, Debtor filed two baseless objections to the Claim that again took months to resolve. Both instances—the Second Settlement Agreement and the two claim objections—are part of Debtor's bad-faith dilatory litigation strategy given its inability to procure committed exit financing.

For its part, the UST does not oppose the motion. It simply requests that, if the court dismisses the case, Debtor be ordered to pay the $4,880.48 in outstanding UST fees for the second quarter of 2016 (and if the case is dismissed by September 30, 2016, then the third quarter fees as well).

Debtor disagrees. As to the latest plan, letters of intent are inherently non-binding. Yet it calls for full payment and then dismissal. In any event, the letter's author is unfamiliar with bankruptcy law—which explains why curing a default under *Entz–White* was not discussed in it. Further, feasibility is a plan confirmation element and irrelevant to the pending motion. Neither the New Capital Partner nor any other investor is going to place $20.5 million into escrow for two or three months without benefit. Simply put, Debtor must demonstrate capital at confirmation, not here.

Debtor does, however, admit that it has not made adequate protection payments to Cottonwood Cajon for two reasons: (1) a sizeable equity cushion protects Cottonwood Cajon; and (2) Cottonwood Cajon has not sought an adequate protection order. Debtor will not voluntarily pay Cottonwood Cajon at the default interest rate absent a court mandate. Further, Cottonwood Cajon offers no proof of value. Debtor has provided two valuations: $44 million in its schedules and $45 million in the Restructured Disclosure Statement. Cottonwood Cajon fails to demonstrate lack of equity and thus by how much it is not adequately protected.

Debtor disagrees that it has not proposed a viable plan in 18 months. It has repeatedly requested a hearing date for its disclosure statement. The issue has been delayed multiple times by virtue of: (1) the claim objection litigation; (2) other disputes with Cottonwood Cajon; and (3) complications with the lakes retention project, including Mr. Richards' alleged stay violation.

Also, Debtor has never engaged in sand or mineral mining and selling it. It did not generate and then misuse cash collateral. Its operations, for reasons set forth in various pleadings, are in the ordinary course of business.

Further, Debtor's property is necessary for an effective reorganization—Cottonwood Cajon cannot show otherwise. Debtor cannot run its golf course operation without the property. And the Restructured Disclosure Statement makes apparent the property's importance and value. The New Capital Partner and others want to invest in Debtor's future because of that value.

As to dismissal, there is no dilatory conduct. Debtor has on multiple occasions requested a disclosure statement hearing date. That process has been delayed for

the above reasons. Debtor's inability to consummate the Second Settlement Agreement was a huge disappointment. The court nevertheless found that: (1) Debtor was not dilatory; and (2) its withdrawal from the agreement was lawful. Additionally, the claim objections were not baseless. The issues were briefed extensively and resulted in opinions that could alter the *Entz–White* jurisprudence in the Ninth Circuit.

Moreover, Debtor recognizes authority supporting dismissal of a two-party dispute. But this is not a two-party dispute given Debtor's operating business, 60 employees, $300,000 per month revenue, junior secured creditors, and over $2 million in unsecured creditors. Dismissal means foreclosure—and the financial and employment losses that brings.

Furthermore, Debtor reiterates that it has not been selling estate assets or using cash collateral. It engaged in creating two water retention lakes in the ordinary course of business. Hanson paid Debtor about $153,000 for hauling the soil away. And while Debtor did violate the Interim Cash Collateral Order, it did so at Debtor's counsel's behest. It was not Debtor's fault.

Finally, Debtor produced over 1,000 documents in response to the Rule 2004 Order. It has met and conferred. At all events, Cottonwood Cajon's remedy is a motion to compel.

In reply, Cottonwood Cajon argues that Debtor fails to meaningfully address the motion's most important points. First, it admits that it does not have financing. And there is no telling when that will change. The fact that the New Capital Partner is not willing to place the $20.5 million in escrow ignores the point that Debtor has no firm commitment from a lender. Regardless, Cottonwood Cajon seriously doubts the New Capital Partner's existence. It is simply another delay tactic. Similarly, the letter of intent is non-binding and contemplates a future sale agreement. It is unclear what Debtor's equity holders receive by the proposed transaction, and there is no financial commitment to support the sale save a $100,000 refundable escrow deposit. And as previously addressed, the letter of intent conflicts with the proposed plan.

In addition, Debtor has stated that it will litigate the reinstatement and cure issues under § 1124(2) in the appellate courts. If Debtor is able to confirm a plan in the meantime, the New Capital Partner will need to invest the Claim's full amount. Those funds will have to be escrowed for years pending the Ninth Circuit's decision. The letter of intent does not contemplate cash escrow, and Debtor admits that no investor will want its money tied up that long.

Moreover, the plan as presently crafted fails to satisfy § 1129(a)(1) because its terms do not comply with § 1124(2). It proposes to avoid paying Cottonwood Cajon default interest, which the court flatly rejected in the First and Second Claim Objection Orders. Debtor will need additional financing to fund the plan. Taken together, its inability to confirm a plan is a basis for granting stay relief. To allow Debtor to continue in bankruptcy means further delay, including a confirmation hearing in November 2016 at the earliest.

Having considered the parties' briefs, evidence, and zealous advocacy at the August 22, 2016 hearing, the court now **grants** the motion in part, **converts** the case to Chapter 7, and **denies** without prejudice Cottonwood Cajon's stay relief request.

## Legal Standard

*Section 1112(b) Motion to Dismiss*

Section 1112(b) provides in relevant part that:

(1) On request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1). Under § 1112(b)(4), cause includes:

(A) Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; ... (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; ... (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; ... (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28 ....

11 U.S.C. §§ 1112(b)(4)(A), (B), (D), (E), (I), (J), and (K). And "cause exists where a debtor lacks good faith in filing its case." *In re SR Real Estate Holdings, LLC*, 506 B.R. 121, 125 (Bankr. S.D. Cal. 2014); *see also Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) ("Although section 1112(b) does not expressly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal."). A finding of a lack of good faith in bankruptcy proceedings "depends on the totality of the facts and circumstances surrounding the particular case." *In re Silberkraus*, 253

B.R. 890, 903 (Bankr. C.D. Cal. 2000); *see also In re SR Real Estate Holdings, LLC*, 506 B.R. at 125 ("The existence of good faith depends on an amalgam of factors and not upon a specific fact. *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986). The bankruptcy court should examine the debtor's financial status, motives, and the local economic environment.") (citing *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986)). In the Ninth Circuit,

[t]o determine whether a debtor has filed a petition in bad faith, courts weigh a variety of circumstantial factors such as whether: (1) the debtor has only one asset; (2) the debtor has an ongoing business to reorganize; (3) there are any unsecured creditors; (4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and (5) the case is essentially a two party dispute capable of prompt adjudication in state court.

*In re St. Paul Self Storage Ltd. P'ship*, 185 B.R. 580, 582–83 (9th Cir. BAP 1995).

 "The bankruptcy court has broad discretion in determining what constitutes 'cause' under section 1112(b)." *In re Sullivan*, 522 B.R. 604, 614 (9th Cir. BAP 2014). But the movant bears the burden of establishing by a preponderance of the evidence that cause exists. *Id.* "Once the movant establishes cause to convert or dismiss the case, the burden shifts to the party opposing the motion, usually the debtor, to establish grounds for applying the exception under § 1112(b)(2) and avoid conversion or dismissal." *In re Hoyle*, No. 10-01484-TLM, 2013 WL 210254, at *13 (Bankr. D. Idaho Jan. 17, 2013).

 Further, "if cause is established, the decision whether to convert or dismiss the case falls within the sound discretion of the court." *In re Sullivan*, 522 B.R. at 612.

If there is cause to dismiss or convert, the court must also: "(1) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate; and (2) identify whether there are unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate." *Id.*; *see also* 11 U.S.C. §§ 1112(b)(1) and (2); *Shulkin Hutton, Inc., P.S. v. Treiger (In re Owens)*, 552 F.3d 958, 961 (9th Cir. 2009) ("The court must consider the interests of all of the creditors."); *In re Kent*, No. 2:07-BK-03238-SSC, 2008 WL 5047799, at *7 (Bankr. D. Ariz. Sept. 23, 2008) ("After finding cause and establishing that no unusual circumstances exist, the Court may dismiss or convert the case or, as noted, appoint a Chapter 11 trustee 'whichever is in the best interests of the creditors and the estate.' ").

 In addition, "regardless of the parties' arguments, the bankruptcy court has an independent obligation under § 1112 to consider a dismissal's impact on what would happen to all creditors on dismissal and, in light of its analysis, whether dismissal or conversion would be in the best interest of all creditors, not just the largest and most vocal creditor." *In re Sullivan*, 522 B.R. at 612–13. Indeed, a bankruptcy court abuses its discretion if it fails to consider whether conversion or dismissal is in the creditors' and the estate's best interests. *Id.*

 "When determining the best interest of creditors under § 1112(b), the Code's fundamental policy of achieving equality among creditors must be a factor considered, 'and it is not served by merely tallying the votes of the unsecured creditors and yielding to the majority interest.' " *In re Sullivan*, 522 B.R. at 613 (quoting *In re Super. Siding & Window, Inc.*, 14 F.3d 240, 243 (4th Cir. 1994)).

Courts consider many factors to determine what is in the best interest of creditors and the estate, including:

(1) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) whether any remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a "single asset"; (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) whether a plan has been confirmed and whether any property remains in the estate to be administered; and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re Hoyle*, 2013 WL 210254, at *15.

## Legal Discussion and Analysis

### *Cottonwood Cajon's Motion to Dismiss*

 The court finds that Cottonwood Cajon meets its burden of establishing cause to convert or dismiss the case under §§ 1112(b)(4)(D), (E), (I) and (K). And Debtor fails to demonstrate a reasonable justification for its various misconduct under § 1112(b)(2)(B)(i). Further, there are no unusual circumstances that prevent the court from converting or dismissing the

case. *See, e.g., In re Prods. Int'l Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008) ("Section 1112(b) does not define 'unusual circumstances.' However, the phrase contemplates conditions that are not common in chapter 11 cases."). For the sake of analytical completeness, the court briefly addresses Cottonwood Cajon's less persuasive arguments.

■■■ First, Debtor has not engaged in dilatory conduct. It is true that Debtor breached the First Settlement Agreement and reneged on the second one. But it is not apparent that it used the Second Settlement Agreement litigation to delay moving this case forward. Indeed, that matter involved an unsettled area of law regarding unilateral withdrawal of a Rule 9019 motion. The same is true of the claim objections. Just because Debtor did not prevail does not mean its objections were baseless. They involved complex challenges under both federal and state law. Roughly $6.8 million was at stake. The district court—and possibly the Ninth Circuit—will ultimately decide the objections' legitimacy. Further, Debtor's counsel has at various status conferences requested a hearing on approval of a plan and disclosure statement. As he correctly asserts, this has been delayed numerous times by other matters in the case. Taken together, Cottonwood Cajon fails to show that Debtor's strategy has been to delay disclosing its investors, remain in bankruptcy despite no hope of reorganization, or otherwise frustrate its rights as a secured creditor.

■■■ Second, the court has already held that this is not a two-party dispute. And nothing has occurred since the last § 1112(b) ruling to change that. To reiterate, the BAP has stated:

"Petitions in bankruptcy arising out of a two-party dispute do not per se constitute a bad-faith filing by the debtors." *In re Stolrow's, Inc.*, 84 B.R. 167, 171 (9th Cir. BAP 1988). Court that find bad faith based on two-party disputes do so where "it is an apparent two-party dispute *that can be resolved outside of the Bankruptcy Court's jurisdiction.*" *Oasis at Wild Horse Ranch, LLC v. Sholes (In re Oasis at Wild Horse Ranch, LLC)*, 2011 WL 4502102 at *10, 2011 Bankr. LEXIS 4314 (9th Cir. BAP Aug. 26, 2011) (emphasis added) (citing *N. Cent. Dev. Co. v. Landmark Capital Co. (In re Landmark Capital Co.)*, 27 B.R. 273, 279 (Bankr. D. Ariz. 1983)); and *see St. Paul Self Storage Ltd. P'ship*, 185 B.R. at 583 (debtor's only significant asset was a claim against one creditor set to be tried in state court and bankruptcy court supervision of debtor's liquidation was not necessary to protect other creditors). Typical bad faith two-party dispute cases may involve delays on the eve of trial (litigation tactics), forum shopping, new-debtor syndrome (special purpose entities), repeat filers, and repeatedly delayed foreclosure sales.

*In re Sullivan*, 522 B.R. at 616. This is not a two-party dispute merely because Cottonwood Cajon is owed the most money. In fact, it is owed only 78.6% of the total debt. There is no evidence that Debtor has engaged in forum shopping—both its cases have been filed in this court. It has not been dilatory on the eve of trial. And it has filed only two cases, though both were to stop a foreclosure. Taken together, the court concludes that this is not a two-party dispute warranting dismissal.

Third, Cottonwood Cajon argues repeatedly that Debtor cannot propose a feasible plan. The court in its discretion will not entertain that assertion here. It arguably falls under §§ 1112(b)(4)(A) and (J). But as Debtor correctly points out, a feasibility analysis is more appropriate at plan confirmation. 11 U.S.C. § 1129(a)(11);

*In re Linda Vista Cinemas*, 442 B.R. 724, 737 (Bankr. D. Ariz. 2010).

Finally, the court will not address Cottonwood Cajon's contention that Debtor violated the Rule 2004 Order by failing to provide certain documents. As Debtor rightly asserts, the appropriate remedy is a motion to compel, not a dismissal request.

Other grounds for conversion or dismissal exist, however. The court now turns to them.

### Section 1112(b)(4)(D): Unauthorized Use of Cash Collateral

 Debtor is correct that the court has not yet ruled on its motion for use of cash collateral. Nor has it determined whether Debtor's water retention project is one in the ordinary course of business. But this argument misses the mark.

It is undisputed that Cottonwood Cajon has a security interest in substantially all of Debtor's real and personal property—including the sand, soil, and minerals on the land. It is also established that Debtor has entered into contracts with Hanson, G & D, and possibly others to excavate the land. In exchange, Debtor sold the soil to Hanson on a per-ton basis. It was, in effect, a barter to offset Debtor's lost income from operations interruptions.

Debtor has contended repeatedly that its lakes retention project is in the ordinary course of business. It confuses § 363's requirements. To start, the soil is estate property. *See generally* 11 U.S.C. § 541(a). And under § 363(c),

(1) If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use proper-

ty of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c)(1). Therefore, if selling excavated sand is in the ordinary course of business, then Debtor may do so without court approval. But § 363(c)(2) states that Debtor may not use, sell, or lease cash collateral under paragraph (1) unless it has either: (1) Cottonwood Cajon's consent; or (2) court authorization after notice and a hearing. 11 U.S.C. § 363(c)(2). Debtor incorrectly attempts to read § 363(c)(1)'s "ordinary course of business" language into § 363(c)(2). Whether or not Debtor sold estate assets in the ordinary course of business, it needed authority to use cash collateral.

Section 363(a) defines cash collateral as cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, ... or profits of property ... whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a). Cottonwood Cajon has a security interest in the soil removed from the land. And the proceeds from selling it are Cottonwood Cajon's cash collateral. Debtor needed either Cottonwood Cajon's consent or court authority to use those funds. It received neither. It was thus obligated to segregate and account for that cash collateral. 11 U.S.C. § 363(c)(4). In addition, the Interim Cash Collateral Order directed the parties to treat any future sums received from Hanson or G & D for soil sales as presumptively cash collateral.

Debtor concedes that Hanson paid it more than $153,000. And Mr. Idler admitted at his deposition that: (1) he has at various times received Debtor's funds into his personal trust account; and (2) after

the court entered the Interim Cash Collateral Order, the Hanson funds were used to pay for equipment rentals. Debtor did not obtain court authorization for this. And it directly circumvents the Interim Cash Collateral Order's mandates.

The court consequently finds cause to convert or dismiss under § 1112(b)(4)(D).

### Section 1112(b)(4)(E): Failure to Comply with a Court Order

The Interim Cash Collateral Order made clear that: (1) the parties should treat future sums from Hanson or G & D for soil sales as presumptively cash collateral; (2) if Debtor wanted to use that cash collateral, it needed to bring a formal motion—otherwise, it could not spend or use any of it; (3) Hanson could finish the existing project, pay Debtor the roughly $153,000 owed for prior work, and continue performing and paying any remaining balance due on the current contract; (4) Debtor was to place all sums received from Hanson, G & D, and any other contractor in a segregated account created for that purpose, and not removed or expend those funds without court authorization.

Whether or not Debtor believes the proceeds are truly cash collateral, it admits violating this order. Both the opposition and Statement of Fault place the blame for this on Debtor's counsel's misunderstanding of the order. This argument is not well taken and, frankly, hard to credit. The order is plain and unambiguous. It is not susceptible of Debtor's interpretation. Both Debtor's counsel and Mr. Idler—who is also an attorney—attended the May 25, 2016 hearing and actively participated. Debtor plainly violated the order, no matter whether it relied on counsel's advice in doing so. *See, e.g., In re Hoyle*, 2013 WL 210254, at *9 ("Further, failure to comply with a court order need not be willful, in bad faith, or fraudulent, because a debtor takes on the responsibilities required by the Code in availing himself of its protections.") (citing *In re Babayoff*, 445 B.R. 64, 80 (Bankr. E.D.N.Y. 2011)).

Accordingly, the court finds cause to convert or dismiss under § 1112(b)(4)(E).

### Section 1112(b)(4)(I): Failure to Timely Pay Post–Petition Taxes

Cottonwood Cajon asserts that Debtor has failed to pay more than $3 million in post-petition property taxes. This can hardly come as a surprise to Debtor. Cottonwood Cajon made the same point in its May 17, 2016 status report. And the UST echoed those sentiments at the status conference the next day. Debtor has never meaningfully addressed the issue, other than to say taxes will be paid through the plan.

Debtor has apparently not paid its property taxes in several years. It admitted missing the March 23, 2014 deadline to pay taxes under the First Settlement Agreement. Indeed, part of its claim objection sought to cure that historical default so that it could proceed under the settlement agreement. The court rejected that argument, and there is no evidence Debtor has paid taxes since. Nor is there evidence that Debtor has kept post-petition taxes current. The court is dubious that Debtor has the financial wherewithal to do so.

The court therefore finds cause to convert or dismiss under § 1112(b)(4)(I).

### Section 1112(b)(4)(K): Failure to Pay United States Trustee Fees

28 U.S.C § 1930 details fees that Debtor must pay in bankruptcy:

[I]n addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is

converted or dismissed, whichever occurs first.

28 U.S.C. § 1930(a)(6).

The UST asserts that Debtor has $4,880.48 in outstanding UST fees for 2016's second quarter. Debtor does not address this in its opposition, though at the August 22, 2016 hearing it claimed to be current. The court is unmoved by this, and concludes that becoming current after the fact is insufficient to avoid a cause finding under § 1112(b)(4)(K).

The court thus finds cause to convert or dismiss under § 1112(b)(4)(K).

*Conversion Is in the Best Interests of All Creditors and the Estate*

 Based on the foregoing, there is cause to convert or dismiss the case. The court finds no unusual circumstances establishing that conversion or dismissal is not in the creditors' and the estate's best interests. And Debtor does not meet its burden of establishing one of § 1112(b)(2)'s exceptions.

Cottonwood Cajon, however, seeks dismissal as an alternative to stay relief. The UST does not oppose the request. Nevertheless, *Sullivan* requires the court to independently analyze whether conversion, dismissal, or a Chapter 11 Trustee appointment is in the creditors' and the estate's best interests. In this instance, conversion appears most appropriate.

As in the First Bankruptcy Case, the parties disagree dramatically over the property's value. Debtor believes it is worth between $44 and $45 million—figures Cottonwood Cajon disputes. In point of fact, the value is unknown and difficult to ascertain. The operative question is what the golf course's going concern value is compared to its liquidation value. Is the property worth most if sold as a functioning golf course? It is not apparent that dismissal is the better option. If the prop-

erty is worth substantially more than Cottonwood Cajon's claim, conversion is preferable. The Chapter 7 Trustee can make that determination and administer the asset accordingly.

Further, a Chapter 11 Trustee appointment is inappropriate. The monthly operating reports indicate that Debtor does not generate sufficient cash to remain a going concern, let alone pay a Chapter 11 Trustee's fees and expenses to keep the golf course running. In addition, the UST has pointed out that Debtor's February 24, 2015 through July 31, 2016 profit and loss statement shows negative $1,436,337.30 in net income (ECF No. 336, p. 51). This includes negative $142,813.06 in net income for July 2016 alone. *Id.* at p. 54.

For these reasons, the court **converts** the case to Chapter 7.

*Cottonwood Cajon's Stay Relief Request*

The court acknowledges Cottonwood Cajon's interest in stay relief. It is very concerning that Debtor has made no adequate protection payments for at least a year and a half. But Cottonwood Cajon has asked for § 1112(b) dismissal as an alternative to stay relief. In performing its analysis, the court has found ample § 1112(b)(4) cause to do so. It is thus obliged to consider conversion, dismissal, or a Chapter 11 Trustee appointment under *Sullivan*. Because the court finds conversion to be the superior option, it does not reach Cottonwood Cajon's stay relief motion. That request is therefore **denied** without prejudice.

**Conclusion**

Cottonwood Cajon has met its burden of establishing cause to convert or dismiss the case under §§ 1112(b)(4)(D), (E), (I), and (K). The court finds no unusual circumstances to prevent it from converting or dismissing the case. Debtor fails to demonstrate that one of § 1112(b)(2)'s ex-

ceptions apply. And the court's independent analysis shows that conversion to Chapter 7 is in the creditors' and the estate's best interests.

Accordingly, the court **grants** the motion in part and **converts** the case to Chapter 7. Because the case is being converted, Cottonwood Cajon's stay relief request is **denied** without prejudice.

The UST is directed to **appoint** a Chapter 7 Trustee forthwith. As the parties agreed at the August 22, 2016 hearing, the court **authorizes** the Chapter 7 Trustee, once appointed, to begin immediately operating Debtor's business for 14 days. *See* 11 U.S.C. § 721. The court expects to see an expedited motion for continued authority after that.

IT IS SO ORDERED.